OPINION OF THE COURT
Kaye, J.
One year ago, applying what appeared to be settled law, we affirmed the dismissal of plaintiffs libel action against the editor of a scientific journal, essentially for his publication of a signed letter to the editor on a subject of public controversy. We concluded that there was no triable issue of fact as to the falsity of the threshold factual assertions of the letter, that— beyond those threshold factual assertions — the letter writer’s statements of opinion were entitled to the absolute protection of the State and Federal constitutional free speech guarantees, and that charges of defendant’s deliberate incitement to have a defamatory letter published lacked factual foundation (Im-muno AG. v Moor-Jankowski, 74 NY2d 548).
 On plaintiffs petition, the United States Supreme Court granted certiorari, vacated our judgment, and remanded the case for further consideration in light of Milkovich v *240 Lorain Journal Co. (497 US —, 110 S Ct 2695), decided June 21, 1990. For the reasons stated below, we adhere to our determination that defendant’s summary judgment motion was properly granted and the complaint dismissed, premising our decision on independent State constitutional grounds as well as the Federal review directed by the Supreme Court.
I.
This libel action arises out of a letter to the editor published in the Journal of Medical Primatology in December 1983. The letter was written by Dr. Shirley McGreal as Chairwoman of the International Primate Protection League (IPPL), an organization known for its vigorous advocacy on behalf of primates, particularly those used for biomedical research. Defendant Dr. J. Moor Jankowski, a professor of medical research at New York University School of Medicine and director of the Laboratory for Experimental Medicine and Surgery in Primates of the New York University Medical Center, is cofounder and editor of the Journal.
The subject of McGreal’s letter (reprinted at 145 AD2d, at 118-120) was a plan by plaintiff, Immuno AG. — a multinational corporation based in Austria that manufactures biologic products derived from blood plasma — to establish a facility in Sierra Leone, West Africa, for hepatitis research using chimpanzees. Voicing the concerns of IPPL, McGreal’s letter was critical of Immuno’s proposal on a number of grounds: (1) that the motivation for the plan was presumably to avoid international policies or legal restrictions on the importation of chimpanzees, an endangered species; (2) that it could decimate the wild chimpanzee population, as capture of chimpanzees generally involved killing their mothers, and it was questionable whether experimental animals could be returned to the wild, as plaintiff proposed; and (3) that returning the animals to the wild could well spread hepatitis to the rest of the chimpanzee population. McGreal stated that the current population of captive chimpanzees should be adequate to supply any legitimate requirements.
The letter was prefaced by an Editorial Note written by defendant that set out its background. Identifying McGreal as Chairwoman of IPPL, the Note stated that the Journal had received the initial version of the letter in January 1983 and *241 had submitted it to plaintiff for comment or reply.[1] Plaintiff had acknowledged receipt of defendant’s letter in February, offering no comment but that it was referring the matter to its New York lawyers. Thereafter, plaintiff’s lawyers wrote that the statements were inaccurate, unfair and reckless, and requested the documents upon which the accusations were based, threatening legal action if the letter were printed before plaintiff had a meaningful opportunity to reply. The Editorial Note went on to state that the editors had advised plaintiff’s attorneys that they should obtain the documentation directly from McGreal, and extended the period for plaintiff’s reply by two months. The letter was published nearly a year after its receipt. In the meantime, articles had appeared in the Austrian press apparently confirming much of what McGreal had written, and defendant received no further word from plaintiff or its lawyers.
In addition to the letter that is the focus of contention, plaintiff complains that it was defamed by comments made by defendant quoted in an article entitled "Loophole May Allow Trade in African Chimps” that appeared in the New Scientist magazine shortly before McGreal’s letter was published. Defendant is quoted as saying that the supply of captive chimpanzees was sufficient for research, describing plaintiff’s attempts to circumvent controls on endangered species as "scientific imperialism,” and warning that they will "backfire on people like me involved in the bona fide use of chimpanzees and other primate animals” for research.
In December 1984, plaintiff commenced this lawsuit against Moor-Jankowski and seven other defendants, including McGreal and the publishers and distributors of the New Scientist and the Journal of Medical Primatology, and it has since been vigorously litigated. By now, all the defendants except Moor-Jankowski have settled with plaintiff for what the motion court described as "substantial sums,” and the complaint has been dismissed as to them. After extensive discovery — his own deposition conducted over 14 days — defendant moved for summary judgment. Supreme Court granted the motion to the *242 extent of dismissing a claim for prima facie tort. It denied the motion as to the defamation claims, ruling that the statements at issue were statements of fact and, regardless of whether plaintiff was a public figure, there were triable issues of fact concerning whether defendant acted with actual malice in making or publishing the statements.
On defendant’s appeal, the Appellate Division unanimously reversed Supreme Court’s judgment (insofar as appealed from), granted defendant’s motion, and dismissed the complaint (145 AD2d 114). The court held that all of the comments attributed to defendant in the New Scientist article were expressions of opinion that could not, as a matter of law, support an action for defamation. As to the McGreal letter, the Appellate Division held that for the most part it too was a constitutionally protected expression of opinion. To the extent there were (in the court’s view) statements of a factual nature, the Appellate Division examined each statement meticulously, and concluded from the voluminous record that plaintiff had failed to adduce evidence of falsity. We now affirm, adopting without further elaboration our prior conclusion as to the lack of factual foundation for the deliberate incitement charges, and concentrating our analysis on the substance of the challenged statements.
II.
Our analysis first focuses on Milkovich, in compliance with the Supreme Court’s direction on remand.
As the Supreme Court wrote, Milkovich leaves in place all previously existing Federal constitutional protections, including the " ' "breathing space” ’ ” which " ' "freedoms of expression require in order to survive” ’ ” (497 US, at —, 110 S Ct, at 2706, quoting Philadelphia Newspapers v Hepps, 475 US 767, 772), and specifically including immunity for statements of opinion relating to matters of public concern that do not contain a provably false factual connotation (497 US, at —, 110 S Ct, at 2706; Philadelphia Newspapers v Hepps, supra). Milkovich, however, puts an end to the perception — as it turns out, misperception — traceable to dictum in Gertz v Robert Welch, Inc. (418 US 323, 339-340) that, in addition to all other Federal constitutional protections, there is a "wholesale defamation exemption for anything that might be labeled 'opinion.’ ” (497 US, at —, 110 S Ct, at 2705, supra.)
Thus, statements of opinion relating to matters of public *243 concern are today no less subject to constitutional protection, but speech earns no greater protection simply because it is labeled "opinion.”
The key inquiry is whether challenged expression, however labeled by defendant, would reasonably appear to state or imply assertions of objective fact. In making this inquiry, courts cannot stop at literalism. The literal words of challenged statements do not entitle a media defendant to "opinion” immunity or a libel plaintiff to go forward with its action. In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person.
As often happens, a court’s application of stated rules to the facts before it illuminates the rules. In this case the exercise is especially instructive.
The Supreme Court in Milkovich reversed the Ohio court’s judgment — in substance reached in the companion case Scott v News-Herald (25 Ohio St 3d 243, 496 NE2d 699) — dismissing plaintiffs defamation complaint. The State court, applying the widely used four-part Oilman formula (Ollman v Evans, 750 F2d 970 [DC Cir], cert denied 471 US 1127 [see especially, Rehnquist, J., dissenting]) for separating immune opinion from actionable fact, had looked first to the article’s specific words as commonly understood, and second to whether the statements were verifiable, and it concluded that on both scores plaintiff would have stated a valid cause of action. The plain import of the challenged statements was that plaintiff had committed perjury, a verifiable fact.
But the Ohio court went on to dismiss the complaint because of the remaining two Oilman factors (the full context of the article in which the challenged statements appear, and the broader social context or setting surrounding the communication).[2] The court was persuaded from the language of the article and its context that the reasonable reader would *244 recognize it as no more than the writer’s opinion on a subject of public concern, and therefore constitutionally protected. "Examining the article in its larger context * * * the large caption ’TD Says’ * * * would indicate to even the most gullible reader that the article was, in fact, opinion” (Scott v News-Herald, 25 Ohio St 3d, at 252, 496 NE2d, at 707, supra) and, because the article appeared on the sports page — a "traditional haven for cajoling, invective, and hyperbole” — the challenged statements by the sports columnist likely would not have been read as charging the crime of perjury in judicial hearings (25 Ohio St 3d, at 253-254, 496 NE2d, at 708).
The United States Supreme Court, looking at basically the same first two Oilman factors, determined that a reasonable fact finder could conclude that the challenged statements in Milkovich implied an assertion that petitioner had perjured himself in a judicial proceeding, and the connotation that petitioner had committed a felony was sufficiently factual to be susceptible of being proved true or false. Those were the same conclusions that had been reached by the Ohio court.
The critical difference lay in the Supreme Court’s treatment of the second two Oilman factors — the immediate and broader context of the article — reduced essentially to one: type of speech. Moreover, the Court made clear that by protected type of speech it had in mind the rhetorical hyperbole, vigorous epithets, and lusty and imaginative expression found in Hustler Mag. v Falwell (485 US 46 [ad parody]); Letter Carriers v Austin (418 US 264 [labor dispute]), and Greenbelt Publ. Assn. v Bresler (398 US 6 [heated real estate negotiation]) — all instances where the Court had determined that the imprecise language and unusual setting would signal the reasonable observer that no actual facts were being conveyed about an individual.
In Milkovich, the Supreme Court resolved "type of speech” considerations in two sentences: "This is not the sort of loose, figurative or hyperbolic language which would negate the impression that the writer was seriously maintaining petitioner committed the crime of perjury. Nor does the general tenor of the article negate this impression.” (Milkovich v Lorain Journal Co., 497 US, at —, 110 S Ct, at 2707, supra.) In this analysis, the Supreme Court said nothing of either the conjectural language of the disputed article, or the format of the piece — a signed editorial column appearing on the sports page. Both those considerations occupied the Ohio court and *245 the dissent at length (see, Milkovich v Lorain Journal Co., supra, at —, 110 S Ct, at 2710-2713 [Brennan, J., dissenting]), ultimately persuading those Judges that no reasonable reader would have regarded the challenged assertions, in their context, as factual. The Supreme Court’s failure to mention either point becomes particularly telling when its writing is laid against the State court opinion and Justice Brennan’s dissent.
Thus, if not alone from the Supreme Court’s statement of the governing rules, then from its application of those rules to the facts of Milkovich, it appears that the following balance has been struck between First Amendment protection for media defendants and protection for individual reputation: except for special situations of loose, figurative, hyperbolic language, statements that contain or imply assertions of provably false fact will likely be actionable.
We next apply Milkovich to the facts before us.
In general, as previously observed, it is hard to conceive that any published statement could be without some factual grounding. In particular, we recognized that the McGreal letter was provoked by a certain state of affairs, that it set out limited points of factual reference, and that to the extent that letter contained defamatory factual statements about plaintiff, they would be actionable if false (74 NY2d, at 559, supra).
Unlike the Supreme Court’s characterization of the analysis done in Scott v News-Herald, we did not, and do not, hold that the assertions of verifiable fact in the McGreal letter were overridden or "trumped” by their immediate or broader context and therefore automatically and categorically protected as opinion. We did not, and do not, hold that all letters to the editor are absolutely immune from defamation actions, or that there is a wholesale exemption for anything that might be labeled "opinion.”
But a libel plaintiff has the burden of showing the falsity of factual assertions (see, Philadelphia Newspapers v Hepps, 475 US 767, 776, supra; Steinhilber v Alphonse, 68 NY2d 283; Silsdorf v Levine, 59 NY2d 8, cert denied 464 US 831), and we concluded that plaintiff did not meet that burden. Given the thorough Appellate Division review of the factual assertions in issue, there hardly seemed a need for repetition of the charges and the relevant evidence. We noted simply that the factual review undertaken by the Appellate Division established that plaintiff had raised no triable issue as to the falsity of any of the threshold factual assertions of the McGreal *246 letter (Immuno AG. v Moor-Jankowski, 74 NY2d 548, 559, supra).
We continue to believe that the Appellate Division review, to the extent it identified assertions of fact and concluded that such assertions had not been shown to be false, established that no triable issue of fact existed. While there still appears no need for us to restate those extensive findings, application of Milkovich to what plaintiff characterizes as the "core libel,” or "core premise,” or "core factual statement” of the IPPL letter illustrates the enduring soundness of that analysis.
According to plaintiff, the core premise of the letter is as follows: "Release of chimpanzee ’veterans’ of hepatitis non-A, non-B research would be hazardous to wild populations, as there is no way to determine that an animal is definitely not a carrier of the disease.”
Applying Milkovich, we discern two assertions of fact, one express and one implied. First, the statement asserts that there is no scientific method for determining if a chimpanzee exposed to the non-A, non-B virus is not a carrier of the disease. Second, the statement implies that plaintiff will release possible carrier-chimpanzees who may endanger the wild population. Both assertions — the existence of a scientific test to determine carrier status, and plaintiff’s plans — are verifiable. Finally, the "type of speech,” unlike Falwell, Letter Carriers or Greenbelt, is restrained, the statements are seriously maintained, and they have an apparent basis in fact.
Though this core premise could be actionable, plaintiff’s complaint was nonetheless properly dismissed because, on the record presented, it was apparent that plaintiff did not satisfy its burden of proving those statements false (see, 145 AD2d, at 139-141; Philadelphia Newspapers v Hepps, 475 US, at 767, supra; Milkovich v Lorain Journal Co., 497 US, at —,110 S Ct, at 2704, supra).
As for the express assertion of the absence of a test, plaintiff has pointed us to no proof establishing a scientific test in the relevant period that could conclusively determine the carrier state in chimpanzees or, more specifically, could definitely rule out that a veteran chimpanzee was not a carrier of the virus. When considered against the extensive record, plaintiff’s effort to establish that there was a fail-proof test, by weaving together isolated fragments of the testimony of various experts (including defendant), simply does not satisfy its legal burden.
*247 To the contrary, what is apparent from the record is that in the relevant period there was an ongoing process of discovery and debate centering on the very existence of a carrier state of the virus, all of which was made even more inconclusive by ambiguity as to precisely when relevant technology was acquired. When asked if it was possible that certain tests for detecting the carrier state would yield negative results even though the chimpanzee carried the virus, plaintiff’s Dr. Johann Eibl replied "[t]here is no proof on that.” Finally, even if the express assertion of the "core premise” had been shown to be false, that assertion would not itself libel plaintiff, because it does not " 'stat[e] actual facts’ about [that] individual.” (Milkovich v Lorain Journal Co., 497 US, at —, 110 S Ct, at 2706, supra; see also, King Prods. v Douglas, 742 F Supp 778, 784 [SD NY].)
Similarly, as the Appellate Division concluded, there was no proof of falsity of the implied assertion of fact — that plaintiff in the relevant period planned to release chimpanzees with no means of definitely determining that they were not carriers of the disease, thus endangering the wild populations. It is clear from the record that plaintiff, in 1983, was considering the option of rehabilitating chimpanzees used at the projected Sierra Leone facility, for return to a natural state (see, 145 AD2d, at 136). With no proof of the falsity of the express assertion that there was a conclusive test of carrier status available in 1983, it follows that there was also no proof of the falsity of the implied assertion that plaintiff planned to return its veteran test animals with no means of definitely determining that they were not hepatitis carriers.
As an additional matter, the Appellate Division considered infectiousness as well as carrier status (the "core premise” refers only to carriers [see, 145 AD2d, at 139]). Although there was testimony that infectiousness might be tested by inoculating a healthy chimpanzee with the blood of a potentially infected animal to see whether the healthy animal developed hepatitis symptoms, plaintiff produced no proof that it would in fact be implementing that procedure at its facility. That procedure was described by Dr. Alfred Prince, a leading expert, as "expensive,” "laborious” and "wasteful,” in that it involved the deliberate infection of healthy chimpanzees to test the infectiousness of animals that had been exposed to the virus. As the Appellate Division noted, "McGreal can hardly be faulted for not assuming that Immuno would necessarily *248 perform the inoculation procedure on every one of the many chimps it intended to return to the wild.” (145 AD2d, at 140.)
In sum, our "further consideration in light of Milkovich” (497 US —, 110 S Ct 2695, supra), using the core premise as illustrative, confirms our conclusion that, on this factual record, summary judgment was properly granted to defendant.[3]
III.
We next proceed to a State law analysis, and also conclude on this separate and independent ground that the complaint was correctly dismissed.
A.
It has long been recognized that matters of free expression in books, movies and the arts generally, are particularly suited to resolution as a matter of State common law and State constitutional law, the Supreme Court under the Federal Constitution fixing only the minimum standards applicable throughout the Nation, and the State courts supplementing those standards to meet local needs and expectations (see, e.g., People ex rel. Arcara v Cloud Books, 68 NY2d 553, 557-558). Indeed, striking an appropriate balance "between the need for vigorous public discourse and the need to redress injury to citizens wrought by invidious or irresponsible speech” (Milkovich v Lorain Journal Co., 497 US, at —, 110 S Ct, at 2703, supra), is consistent with the traditional role of State courts in applying privileges, including the opinion privilege, which have their roots in the common law (see, Immuno AG. v Moor-Jankowski, 74 NY2d, at 555, supra; Cole Fisher Rogow, Inc. v Carl Ally, Inc., 25 NY2d 943; Julian v American Business Consultants, 2 NY2d 1; Hoeppner v Dunkirk Print. Co., 254 NY 95, 99).
*249 This State, a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas (Matter of Beach v Shanley, 62 NY2d 241, 255-256 [Wachtler, J., concurring]). That tradition is embodied in the free speech guarantee of the New York State Constitution, beginning with the ringing declaration that "[e]very citizen may freely speak, write and publish * * * sentiments on all subjects.” (NY Const, art I, § 8.) Those words, unchanged since the adoption of the constitutional provision in 1821, reflect the deliberate choice of the New York State Constitutional Convention not to follow the language of the First Amendment, ratified 30 years earlier, but instead to set forth our basic democratic ideal of liberty of the press in strong affirmative terms (see, Forkosch, Freedom of the Press: Croswell’s Case, 33 Fordham L Rev 415 [1965]).
"The expansive language of our State constitutional guarantee (compare, NY Const, art I, § 8, with US Const 1st Amend), its formulation and adoption prior to the Supreme Court’s application of the First Amendment to the States * * * the recognition in very early New York history of a constitutionally guaranteed liberty of the press * * * and the consistent tradition in this State of providing the broadest possible protection to 'the sensitive role of gathering and disseminating news of public events’ * * * all call for particular vigilance by the courts of this State in safeguarding the free press against undue interference.” (O’Neill v Oakgrove Constr., 71 NY2d 521, 528-529.)
Thus, whether by the application of "interpretive” (e.g., text, history) or "noninterpretive” (e.g., tradition, policy) (see, People v P. J. Video, 68 NY2d 296, 302-303, cert denied 479 US 1091) factors, the "protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by” the Federal Constitution (O’Neill v Oakgrove Constr., 71 NY2d, at 529, n 3, supra).
Had defendant initially presented the issue as one of independent State constitutional law, instead of as an undenominated argument premised on the assumed identity of State and Federal law, it might have been resolved on that basis a year ago. The intervening occurrence of Milkovich, however, does not cause us to change our explicit conclusion that the case was correctly analyzed and decided in accordance with the core values protected by the State Constitution (see, 74 NY2d, at 560, supra; see also, People v Class, 67 NY2d 431). *250 Several considerations impel us to restate those conclusions separately now, underscoring that we decide this case on the basis of State law independently, and that in our State law analysis reference to Federal cases is for the purpose of guidance only, not because it compels the result we reach (see, Michigan v Long, 463 US 1032, 1038, n 4, 1041-1042).
First and foremost, we look to our State law because of the nature of the issue in controversy — liberty of the press— where this State has its own exceptional history and rich tradition (see, discussion, at 249, supra). While we look to the unique New York State constitutional text and history, our analysis also is informed by the common law of this State. It has long been our standard in defamation actions to read published articles in context to test their effect on the average reader, not to isolate particular phrases but to consider the publication as a whole (see, e.g., James v Gannett Co., 40 NY2d 415, 419-420; Julian v American Business Consultants, 2 NY2d 1, 14-15, supra).
Second, we are mindful not only of our role in the Federal system but also of our responsibility to settle the law of this State. As has been observed, Milkovich may leave an area of uncertainty for future litigation, with courts and authors in the interim lacking clear guidance regarding the opinion privilege; while all of the Supreme Court Justices agreed on the rule, they differed sharply as to how the rule should be applied. If we again assume the identity of State and Federal law, and assume that Milkovich has effected no change in the law, we perpetuate the uncertainty in our State law. Moreover, we are concerned that — if indeed "type of speech” is to be construed narrowly — insufficient protection may be accorded to central values protected by the law of this State. We would begin the analysis — just as we did previously in this case, and just as we did in Steinhilber (68 NY2d, at 293, supra) —with the content of the whole communication, its tone and apparent purpose. That is a clear and familiar standard that in our view properly balances the interests involved. It has been consistently applied throughout the State for several years, following State common law and following Steinhilber.
Finally, the case comes to us in the posture of a summary judgment motion, which searches the record and presents only issues of law. The State law issues have now been fully briefed, and there are no factual questions to be resolved. As the Supreme Court noted in Milkovich, the Ohio court re *251 mains free, on remand some 15 years after the challenged article, to address State law issues (497 US, at —, 110 S Ct, at 2702, n 5, supra); were this case to be heard by the Supreme Court and reversed, that would be equally true on a further remand to this Court. In view of the costly,[4] sizeable record already amassed, including hundreds of pages of briefs, no purpose is served by compelling these parties, on this record and these briefs, to consider another trip to Washington, with the prospect that State law review before this Court would ultimately be available.
None of the concerns expressed in the Simons concurrence persuade us that the requested State law review should be deferred or denied.
Any independent State law activity in one sense can frustrate the pronouncement of Federal law. In another sense, however, State constitutional law review — which is a responsibility of State courts and a strength of our Federal system— advances the process of pronouncing Federal law; a State can act as a "laboratory” in more ways than one, as indeed Justice Brandéis recognized in New State Ice Co. v Liebmann in his reference to State statutes (285 US 262, 311 [dissenting]; see also, Batson v Kentucky, 476 US 79, especially, at 82, n 1). By the same token, Federal cases, including Supreme Court cases —even Milkovich itself — can act as a source of guidance for State courts in formulating State law, even though interpretation of those cases in State law decisions reached on adequate and independent State grounds will be unreviewable by the Supreme Court (see, Michigan v Long, 463 US, at 1041, supra).
In analyzing cases under the State Constitution, this Court has not wedded itself to any single methodology, recognizing that the proper approach may vary with the circumstances (see, e.g., Rivers v Katz, 67 NY2d 485 [primacy method]; People v Stith, 69 NY2d 313, 316, n [dual method]; People ex rel. Arcara v Cloud Books, 68 NY2d 553, supra [interstitial method]). Several times recently we have pointedly rested our decisions on both Federal and independent State constitutional grounds (see, e.g., O’Neill v Oakgrove Constr., 71 NY2d, at 528, supra; People v Stith, supra).
That analysis is particularly appropriate here because of the unusual procedural posture of the case. The Supreme Court *252 has specifically directed us to consider the case in light of Milkovich, and we comply with that direction, as courts throughout the Nation have done in similar circumstances (see, e.g., People v Duncan, 124 Ill 2d 400, 530 NE2d 423 [1988]). But that does not compel us to ignore our prior decision or the arguments fully presented on remand that provide an alternative basis for resolving the case (see, Hellman, Granted, Vacated, and Remanded — Shedding Light on a Dark Corner of Supreme Court Practice, 67 Judicature 389, 394-395 [1984]).[5] Turning our back on the now developed, controlling State law issues would be no service to the Supreme Court, or the litigants, or the law of this State.
We therefore proceed to resolve this case independently as a matter of State law, concluding that — as we previously held in Immuno — the standard articulated and applied in Steinhilber furnishes the operative standard in this State for separating actionable fact from protected opinion.
B.
Letters to the editor, unlike ordinary reporting, are not published on the authority of the newspaper or journal. In this case, for instance, defendant’s prefatory Editorial Note signaled that the letter was to be given only the weight its readers chose to accord McGreal’s views; such reservations may be generally understood even when letters are not accompanied by any editorial note. Thus, any damage to reputation *253 done by a letter to the editor generally depends on its inherent persuasiveness and the credibility of the writer, not on the belief that it is true because it appears in a particular publication.
Significantly, for many members of the public, a letter to the editor may be the only available opportunity to air concerns about issues affecting them. A citizen troubled by things going wrong "should be free to 'write to the newspaper’: and the newspaper should be free to publish [the] letter. It is often the only way to get things put right.” (Slim v Daily Tel., [1968] 1 All ER 497, 503, quoted in Pollnow v Poughkeepsie Newspapers, 107 AD2d 10, 16 [Titone, J.], affd on other grounds 67 NY2d 778.) The availability of such a forum is important not only because it allows persons or groups with views on a subject of public interest to reach and persuade the broader community but also because it allows the readership to learn about grievances, both from the original writers and from those who respond, that perhaps had previously circulated only as rumor; such a forum can advance an issue beyond invective. Finally, at the least, the public may learn something, for better or worse, about the person or group that wrote such a letter (see, Franklin, Libel and Letters to the Editor: Toward an Open Forum, 57 U Colo L Rev 651, 663-664 [1986]). Thus, in determining how the average person would view McGreal’s letter, we take into account that it is a letter to the editor and that "[t]he common expectation of a letter to the editor is not that it will serve as a vehicle for the rigorous and comprehensive presentation of factual matter but as one principally for the expression of individual opinion.” (145 AD2d, at 129.)
Passing from the broader social setting to the immediate context of the letter, we note that the common expectation regarding letters to the editor has particular pertinence here.
As the Appellate Division observed, the Journal of Medical Primatology is directed to a highly specialized group of readers — medical doctors, researchers and the medical and science libraries of academic institutions. The average reader is thus likely not a novice in the field of medical primatology, but brings "a well-developed understanding of the issues facing biomedical researches using primates as research subjects.” (145 AD2d, at 129.) The prefatory Note additionally called particular attention to the circumstances surrounding the letter, pointing up that this was McGreal’s view, and that *254 plaintiffs attorneys considered her statements to be "wholly inaccurate and reckless” and "not a fair comment” on plaintiffs proposed project.
The letter itself related to a public controversy regarding use of live animals belonging to endangered species, including chimpanzees, in animal experimentation and research. McGreal (a known animal rights activist) and IPPL (whose very name broadcasts its point of view) were fully identified to readers of the letter. The letter made clear that its purpose was to voice the conservationist concerns of this partisan group in order "to draw this situation to the attention of interested parties.” Thus, like the broader social setting of McGreal’s letter, the immediate context of the letter, together with the prefatory Note, would induce the average reader of this Journal to look upon the communication as an expression of opinion rather than a statement of fact, even though the language was serious and restrained.
Given the purpose of court review — to determine whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff — we believe that an analysis that begins by looking at the content of the whole communication, its tone and apparent purpose (Steinhilber v Alphonse, 68 NY2d, at 293, supra) better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions, and finds them actionable unless couched in loose, figurative or hyperbolic language in charged circumstances (see generally, Note, Fact and Opinion in Defamation: Recognizing the Formative Power of Context, 58 Fordham L Rev 761 [1990]). A media defendant surely has no license to misportray facts; false statements are actionable when they would be perceived as factual by the reasonable person. But statements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying any facts.
The difference is more than theoretical. In the present case, for example, we conclude that what plaintiff now characterizes as the "core premise” of the IPPL letter both expressed and implied statements of fact that, if shown to be false (which they were not), would be actionable. That is true as well of other factual reference points considered by the Appellate Division and held to be lacking in demonstrated falsity. Our State law analysis of the remainder of the letter, how *255 ever, would not involve the fine parsing of its length and breadth that might now be required under Federal law for speech that is not loose, figurative or hyperbolic (see, e.g., Unelko Corp. v Rooney, 912 F2d 1049 [9th Cir]). Isolating challenged speech and first extracting its express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context.
We conclude that the body of the letter in issue communicated the accusations of a group committed to the protection of primates, and that the writer’s presumptions and predictions as to what "appeared to be” or "might well be” or "could well happen” or "should be” would not have been viewed by the average reader of the Journal as conveying actual facts about plaintiff. It may well be, for example, that McGreal’s statements regarding plaintiff’s motivations — if studied long enough in isolation — could be found to contain implied factual assertions, but viewed as IPPL’s letter to the editor, it would be plain to the reasonable reader of this scientific publication that McGreal was voicing no more than a highly partisan point of view.
Thus, we conclude that an approach that takes into account the full context of challenged speech, as previously set forth in Immuno and Steinhilber, accords with the central value of assuring "full and vigorous exposition and expression of opinion on matters of public interest.” (Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 384, cert denied 434 US 969.)
The public forum function of letters to the editor is closely related in spirit to the "marketplace of ideas” and oversight and informational values that compelled recognition of the privileges of fair comment, fair report and the immunity accorded expression of opinion. These values are best effectuated by according defendant some latitude to publish a letter to the editor on a matter of legitimate public concern — the letter’s author, affiliation, bias and premises fully disclosed, rebuttal openly invited — free of defamation litigation. A publication that provides a forum for such statements on controversial matters is not acting in a fashion "at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected” (Garrison v Louisiana, 379 US 64, 75), but to the contrary is fostering those very values.
*256 Finally, we reaffirm our regard for the particular value of summary judgment, where appropriate, in libel cases (see, Karaduman v Newsday, Inc., 51 NY2d 531, 545). Indeed, this is an additional ground for preferring the independent State law approach to one that might make summary disposition less likely (see, Milkovich v Lorain Journal Co., 497 US, at —, 110 S Ct, at 2698, supra; see also, Florida Med. Center v New York Post Co., 568 So 2d 454 [Fla Dist Ct App]). The chilling effect of protracted litigation can be especially severe for scholarly journals, such as defendant’s, whose editors will likely have more than a passing familiarity with the subject matter of the specialized materials they publish. If required as to every line of a reader’s expressed viewpoint to meet the standard of Chapadeau v Utica Observer-Dispatch (38 NY2d 196), they may as a practical matter have little alternative to lengthy litigation or substantial settlement. In such instances, hypertechnical parsing of a possible "fact” from its plain context of "opinion” loses sight of the objective of the entire exercise, which is to assure that — with due regard for the protection of individual reputation — the cherished constitutional guarantee of free speech is preserved.[6]
*257 Accordingly, upon reargument, following remand by the Supreme Court of the United States, we again conclude that the order of the Appellate Division should be affirmed, with costs.

. The letter defendant actually sent to plaintiff enclosed the McGreal letter, noting that "if the allegations in her letter can be proved to us to be incorrect we will return the letter to Dr. McGreal declining its publication.” It further noted "past results of interventions” by McGreal regarding animal exportation and experimentation programs in India, Bangladesh and elsewhere, and that "[i]t is the policy of the Journal to allow all the concerned parties to take a position in a controversial matter.”

. In Milkovich’s action (Scott pursued a separate action on the same article), the Ohio Supreme Court — only shortly before Oilman was handed down — had actually reversed the summary judgment awarded to defendants, concluding that the statements in issue were factual assertions and not constitutionally protected opinion (Milkovich v News-Herald, 15 Ohio St 3d 292, 473 NE2d 1191, cert denied 474 US 953). Only after Oilman did the Ohio Supreme Court dismiss the complaints — Scott’s as well as Milkovich’s —as protected opinion. From the case chronology it is obvious that the Ohio court considered the latter two Oilman factors determinative.

. In this section of the opinion, we follow plaintiffs format, analyzing the "core premise” under Milkovich. Plaintiff additionally continues to press all of its prior defamation claims, and makes clear that its case is not limited to the core premise. While we believe that we have complied with the Supreme Court mandate by reviewing the express and implied factual assertions of the McGreal letter and New Scientist article as they were identified by the Appellate Division, it is impossible to state with complete certainty that some of the statements previously considered protected opinion, because of the language and format of the speech, would not now be viewed as implied assertions of fact. This may be an area of uncertainty left open by Milkovich (see, The Supreme Court, 1989 Term — Leading Cases, 104 Harv L Rev 219, 226-227 [1990]).

. The affidavit of one of the original parties, dated September 3, 1986, indicates that the insurance company settled with plaintiff over her protest when legal costs exceeded several hundred thousand dollars.

. As Professor Heilman indicates in this and his fuller treatment of the subject of Supreme Court orders of "grant, vacate and remand” (the GVR) (see, Heilman, The Supreme Court’s Second Thoughts: Remand for Reconsideration and Denials of Review in Cases Held for Plenary Decisions, 11 Hastings Const LQ 5 [1983]), the GVR remains a mystery to most of the legal profession (id., at 5-6). Of 90 cases he studied in which there was at least a surface inconsistency between the vacated judgment and the cited decision, the lower court in more than 60 adhered to its original ruling, reviewing the Supreme Court decision but upholding its own earlier judgment on some other ground (67 Judicature, at 394-395). There is no basis for the declaration that the Supreme Court here was "indicating its desire to pass on the issues of Federal law and, as a matter of comity, remitted the case to us before ruling so that we might reconsider it in light of the intervening Milkovich decision.” (Simons, J., concurrence, at 262.) Moreover, the word "illegitimate” is taken wholly out of context from Bice, Anderson and the Adequate State Ground, 45 S Cal L Rev 750 (1972) (concurrence, at 261). Indeed, the author of that article makes clear that foreclosing dual constitutional analysis in all circumstances "would prevent the legitimate efficiency gains that fully deciding the state and federal claims often can provide”. (Id., at 758.)

. A few words are in order about the various concurrences. All of the concurrers joined unanimously in the first Immuno opinion (which invoked both the State and Federal Constitutions as the basis for decision), they joined unanimously in the Steinhilber analysis beginning with the content of the whole communication, its tone and apparent purpose (68 NY2d 283, 293), and they all now join unanimously in awarding summary judgment to defendant.
Judge Simons would affirm on Federal constitutional grounds alone, deferring the State constitutional issues that have been fully briefed and argued for a further remand by the United States Supreme Court. Judge Hancock also would affirm on Federal constitutional grounds alone. Unlike Judge Simons, however, he does not view dual constitutional analysis as "illegitimate” (see, e.g., People v Cintron, 75 NY2d 249, 259 [Hancock, Jr., J.]; People v Dietze, 75 NY2d 47, 50, n 1 [Hancock, Jr., J.]; Seawall Assocs. v City of New York, 74 NY2d 92,115-116 [Hancock, Jr., J.]; O’Neill v Oakgrove Constr., 71 NY2d 521, 528-529 [Hancock, Jr., J.]; People v Stith, 69 NY2d 313, 316, n [Hancock, Jr., J.]). Judge Titone agrees (Titone, J., concurrence, at 263-264).
Because the Federal analysis is conclusive, Judges Simons and Hancock would decide this case on Federal law alone. Because the Federal analysis is inconclusive, Judge Titone would decide this case on State law alone. Judge Titone, however, would not decide the case on the basis of State constitutional law, as briefed and argued by the parties. Although he would reach "essentially the same conclusion that the majority has reached” (Titone, J., concurrence, at 266), he would do so on the basis of State common law. Apart from the fact that defendant has not tendered his argument on this basis, *257 the first Immuno opinion was expressly premised on State and Federal constitutional grounds. Even on a clean slate, this Court has not previously wedded itself to the primacy methodology (Titone, J., concurrence, at 264-265), nor have we hesitated to recognize a constitutional right with its source in the common law (see, e.g., Rivers v Katz, 67 NY2d 485).
Among the possible approaches to the single result we all agree is correct —the concurrers have now put the full range of alternatives before the public — we continue to believe that the majority’s choice best serves all of the interests at stake.