[738 NYS2d 462]

SAMUEL C. BALDERMAN, M.D., Respondent, v AMERICAN BROADCASTING COMPANIES, INC., Appellant.

Fourth Department, March 15, 2002

*Cahill Gordon & Reindel,* New York City (*Floyd Abrams* of counsel); *Phillips, Lytle, Hitchcock, Blaine & Huber,* Buffalo, for appellant.

*Sullivan Oliverio & Gioia LLP,* Buffalo (*Richard T. Sullivan* of counsel), for respondent.

### OPINION OF THE COURT

GREEN, J.P.

This defamation action arises out of a nationally televised broadcast of defendant's television news program, "PrimeTime Live." The segment of the program at issue, entitled "Surgical Scorecards," concerned a study published by the New York State Department of Health (DOH) on cardiac surgery in New York State. Plaintiff, a cardiac surgeon, alleges that, during the "Surgical Scorecards" segment, defendant falsely accused him of lying about his performance as reflected in the DOH study. We conclude that the allegedly defamatory statements

are nonactionable statements of opinion, and that defendant's conduct was not grossly irresponsible. Thus, defendant's motion for summary judgment dismissing the second amended complaint should have been granted.

During the late 1980's, DOH developed the Cardiac Surgery Reporting System (CSRS), a system designed to permit realistic evaluation of the risks confronting cardiac surgery patients and meaningful comparisons of the quality of surgical performance at New York hospitals. Prior to the development of CSRS, DOH collected data on crude mortality rates for hospitals and surgeons, reflecting the number of deaths occurring during cardiac surgery at particular hospitals and performed by particular surgeons. The crude mortality rate is calculated by simply dividing the number of deaths by the number of surgeries performed. CSRS was intended to provide a more complex and revealing picture by incorporating data concerning various risk factors such as age and prior medical history into the mortality figures. Based upon those risk factors, CSRS first calculates expected mortality rates for hospitals and surgeons. Deviations from those expected mortality rates are then used to calculate risk-adjusted mortality rates for hospitals and surgeons. Risk-adjusted rates are designed to provide a fairer comparison of surgical performance than crude mortality rates by accounting for differences in the patient population confronting cardiac surgery.

In December 1990 DOH published the risk-adjusted mortality rates for hospitals performing adult cardiac surgery in New York. Erie County Medical Center (ECMC), the hospital where plaintiff performed cardiac surgery, had the highest risk-adjusted mortality rates and ranked last in the state for the period encompassed by the DOH study. Risk-adjusted mortality rates for individual cardiac surgeons were not provided to the general public at that time, but were instead provided to the hospitals where those surgeons practiced. Further, unlike the hospitals included in the study, cardiac surgeons were not comparatively ranked by DOH based upon their risk-adjusted mortality rates.

As the result of a lawsuit initiated under the Freedom of Information Law (Public Officers Law art 6), DOH released to the general public the risk-adjusted mortality rates for individual cardiac surgeons state-wide, including plaintiff (*see, Matter of Newsday, Inc. v New York State Dept. of Health,* 1991 WL 285624 [Sup Ct, Albany County, Oct. 15, 1991]). In December 1991 those rates were reported in Newsday and rates limited

to Buffalo-area surgeons were reported in the Buffalo News. In addition, DOH prepared a booklet containing the risk-adjusted mortality rates for each hospital performing cardiac surgery and each cardiac surgeon in New York. All of the publications report plaintiff's risk-adjusted mortality rate as 8.48%, compared to the state-wide average of 3.32%.

Following the publication of the DOH study, colloquially known as "the Scorecard," defendant initiated an investigation into the use of the Scorecard by patients, surgeons and hospitals. As part of that investigation, defendant conducted an undercover interview of plaintiff with a hidden camera. The interview was conducted by two of defendant's employees posing as the son and daughter of a prospective patient in need of coronary artery bypass graft surgery. A few days later, after the undercover interview, defendant's reporter Chris Wallace conducted an on-camera interview of Dr. Bradley Truax, Assistant Medical Director of ECMC. The on-camera interview of Dr. Truax, combined with portions of the undercover interview of plaintiff, form the basis of this action. Defendant broadcast the following exchange between Wallace and Dr. Truax during the "Surgical Scorecards" segment of "PrimeTime Live":

> "Wallace: Do you view the scorecards as nonsense?
>
> "Dr. Truax: Not at all.
>
> "Wallace: Would you tell patients, or want your doctors to tell patients, that scorecards are nonsense?
>
> "Dr. Truax: No, because I don't think that they are nonsense.
>
> "Wallace: The reason I ask is because we had someone come in, posing as a relative of a patient * * *.
>
> "Wallace [voice-over]: PrimeTime staffers had gone into ECMC undercover, supposedly shopping for a surgeon, to see what doctors there actually tell patients about scorecards. We met with heart surgeon Samuel Balderman [plaintiff], whose mortality rate for 1989 and '90 was 8.48 percent, more than two and a half times the state average. We asked him first about the scorecard on hospitals.
>
> " 'PrimeTime Live' Associate Producer Michael Cowan [posing as son of prospective cardiac patient]

[hidden camera]: Are those statistics really something that you know, I should be learning about?

"Plaintiff: Those statistics are—are, in our opinion, nonsense. This is something that the bureaucracy has created.

"Wallace [voice-over]: Then we asked [Dr.] Balderman how he did on the scorecard. In fact, of the 112 surgeons on the list still practicing in New York, [Dr.] Balderman ranked 103rd.

"Cowan [hidden camera]: And how did you do?

"Plaintiff: I was somewhere in the middle. I was somewhere in the middle, which is—doesn't bother me because we do different things, different types of patients here.

"Wallace: The doctor said that these scorecards are nonsense.

"Dr. Truax: Well, clearly, we believe them. Individual surgeons may not believe them, but the hospital believes in them.

"Wallace: Dr. Balderman says that he finished somewhere in the middle. * * * [P]lain and simple, he just wasn't representing where he had finished.

"Dr. Truax: That's correct.

"Wallace: Do you think he was being upfront with this patient?

"Dr. Truax: I would say no."

Plaintiff commenced this action seeking damages for injury to his reputation allegedly resulting from the "PrimeTime Live" broadcast. In the first cause of action, identified simply as "intentional tort," plaintiff alleges that defendant tricked and deceived him into making statements that were secretly recorded and edited in order to make him appear deceptive, untruthful, unethical, incompetent and untrustworthy. The second cause of action, sounding in defamation, alleges that defendant broadcast false statements of fact characterizing plaintiff as deceptive, untruthful, unethical and lacking in professional skill. The second cause of action further alleges that defendant acted with gross irresponsibility in broadcasting the "Surgical Scorecards" segment. Following discovery, defendant moved for summary judgment dismissing the second

amended complaint. Supreme Court erred in denying the motion.

Because of the potential chilling effect of protracted litigation on free expression, the courts of this state acknowledge "the particular value of summary judgment, where appropriate, in libel cases" (*Immuno AG. v Moor-Jankowski,* 77 NY2d 235, 256, *cert denied* 500 US 954; *see, Karaduman v Newsday, Inc.,* 51 NY2d 531, 545, *rearg denied* 52 NY2d 899; *Park v Capital Cities Communications,* 181 AD2d 192, 195, *appeal dismissed* 80 NY2d 1022, *lv denied in part and dismissed in part* 81 NY2d 879). Addressing the second cause of action first, we conclude that summary judgment is particularly appropriate here. The issue whether the allegedly defamatory statements that plaintiff "wasn't representing where he had finished" on the Scorecard and was not "upfront" in asserting that he finished somewhere in the middle are expressions of fact or opinion is one of law for the court to decide (*see, Steinhilber v Alphonse,* 68 NY2d 283, 290; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 381, *rearg denied* 42 NY2d 1015, *cert denied* 434 US 969; *Park v Capital Cities Communications, supra* at 196). In deciding that issue, we must consider "the content of the whole communication, its tone and [its] apparent purpose" (*Immuno AG. v Moor-Jankowski, supra* at 250) and determine "what the average person hearing * * * the communication would take it to mean" (*Steinhilber v Alphonse, supra* at 290).

In our view, the average person, hearing the entire exchange between Wallace and Dr. Truax, would recognize the allegedly defamatory statements as expressions of opinion (*see, Amodei v New York State Chiropractic Assn.,* 160 AD2d 279, 280, *affd* 77 NY2d 890 [chiropractor accused of "unprofessional conduct"]; *Park v Capital Cities Communications, supra* at 195-196 [eye surgeon characterized as "rotten apple"]; *Hollander v Cayton,* 145 AD2d 605, 606 [physician labeled "immoral" and "unethical" and accused of having "mismanaged cases"]). The statements that plaintiff "wasn't representing where he had finished" and was not being "upfront" about his performance on the Scorecard were preceded by a recitation of the facts on which those statements were based and thus constitute nonactionable expressions of "pure opinion" (*Steinhilber v Alphonse, supra* at 289). Specifically, defendant reported that: (1) plaintiff's risk-adjusted mortality rate for 1989 and 1990 was 8.48%; (2) plaintiff's risk-adjusted mortality rate for that period was more than 2½ times the state-wide average;

(3) of cardiac surgeons still practicing in New York, plaintiff ranked 103rd out of 112; and (4) plaintiff represented that he was "somewhere in the middle." Given those disclosed facts, the allegedly defamatory statements imputing a lack of candor to plaintiff would be understood by the average person hearing them as "personal surmise built upon those facts" (*Gross v New York Times Co.,* 82 NY2d 146, 155). The statements at issue are thus not actionable because a "proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture" (*Gross v New York Times Co., supra* at 154).

Plaintiff's submissions in opposition to the motion serve to buttress our conclusion that defendant's statements constitute nonactionable opinion rather than actionable statements of fact. Plaintiff submitted his own affidavit and the affidavit of a statistician in an effort to establish that plaintiff was in fact "somewhere in the middle" of the Scorecard. In essence, plaintiff challenges the validity of the conclusions drawn by defendant from the facts disclosed in its broadcast by offering contrary conclusions. In relying upon his own opinion and the opinion of an expert statistician to controvert defendant's conclusions, however, plaintiff undermines his position that defendant made false assertions of fact (*see, Roth v Tuckman,* 162 AD2d 941, 942, *lv denied* 76 NY2d 712).

Plaintiff's submissions also fail to demonstrate that the allegedly defamatory statements are based upon a "gross distortion" or "misrepresentation of fact" (*Silsdorf v Levine,* 59 NY2d 8, 14, *cert denied* 464 US 831) and thus constitute actionable "mixed opinion" (*Steinhilber v Alphonse, supra* at 290; *Chalpin v Amordian Press,* 128 AD2d 81, 85). It is undisputed that defendant, using data supplied by the Scorecard, accurately set forth the risk-adjusted mortality rate of plaintiff, compared that rate to the state-wide average, and determined his ranking among cardiac surgeons practicing in New York by comparing his risk-adjusted mortality rate to those of the other surgeons. The statistical proof submitted by plaintiff is insufficient to meet his burden of showing the falsity of the factual assertions underlying the opinions in defendant's broadcast (*see, Prozeralik v Capital Cities Communications,* 82 NY2d 466, 473; *Immuno AG. v Moor-Jankowski, supra* at 245). In view of the fact that the Scorecard disclosed only risk-adjusted mortality rates, the statistical analysis purporting to demonstrate that plaintiff's crude mortality rate is "somewhere in the middle" of cardiac surgeons state-wide does not cast doubt

upon the accuracy of defendant's report on the Scorecard. Further, opinion evidence that differences in risk-adjusted mortality rates between surgeons are not statistically significant and can be misleading may call into question the usefulness of the Scorecard, but not the accuracy of defendant's report on it.

Based upon the risk-adjusted mortality rates set forth in the Scorecard and the calculations derived by defendant from the DOH data, moreover, we conclude that defendant's allegedly defamatory statements are not demonstrably false, even if they are construed as statements of fact. The undercover interviewer inquired about plaintiff's performance based upon "statistics" contained in a "report by the state that looked at hospitals." Plaintiff responded that he was "somewhere in the middle." In light of the fact that plaintiff had a risk-adjusted mortality rate that was more than 2¹/₂ times the state average and exceeded the rates of 102 of the other 112 cardiac surgeons practicing in New York, defendant's characterization of the response of plaintiff as not "representing where he had finished" and as not "upfront" is not demonstrably false. Evidence that plaintiff's response was truthful and accurate if the DOH data is interpreted in a certain fashion is insufficient to establish the falsity of defendant's characterization, which is fully supported by a different interpretation of the DOH data (*see, Mahoney v Adirondack Publ. Co.,* 71 NY2d 31, 40).

Plaintiff further contends that the proof challenging the reliability of the statistics contained in the Scorecard establishes that defendant acted with gross irresponsibility in stating, without qualification, that he was not "upfront" in responding to the question about his performance. Plaintiff's statistical proof, however, is no more availing in demonstrating fault than it is in demonstrating falsity. Because the "Surgical Scorecards" segment involves a matter of legitimate public concern, plaintiff bears the burden of establishing that defendant "acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties" (*Chapadeau v Utica Observer-Dispatch,* 38 NY2d 196, 199). That standard demands no more of defendant than that it "utilize methods of verification that are reasonably calculated to produce [an] accurate" broadcast (*Karaduman v Newsday, Inc., supra* at 549; *see, Lee v City of Rochester,* 254 AD2d 790, 792). Defendant established that it utilized such methods in connection with the "Surgical Scorecards" segment. The underlying facts concerning plaintiff's performance on the Scorecard were gleaned from the

statistics made public by DOH, an authoritative official source (*see, Freeze Right Refrig. & A.C. Servs. v City of New York,* 101 AD2d 175, 184). In addition, defendant confirmed with reliable and knowledgeable sources, including DOH employees involved in the preparation of the Scorecard, that those statistics did not support the position of plaintiff that he was "somewhere in the middle." The fact that defendant consulted other knowledgeable and reliable sources who questioned the reliability of the Scorecard and supported the type of statistical analysis advocated by plaintiff would not "justify a jury in concluding that defendant[ ] had acted in a grossly irresponsible manner" in characterizing plaintiff's response to the undercover interviewer as less than candid (*Gaeta v New York News,* 62 NY2d 340, 350). Defendant's decision to omit or downplay information provided by sources critical of the Scorecard is a "matter of editorial judgment in which the courts, and juries, have no proper function" (*Rinaldi v Holt, Rinehart & Winston, supra* at 383; *see, Sprecher v Dow Jones & Co.,* 88 AD2d 550, 551, *affd* 58 NY2d 862; *Mitchell v Herald Co.,* 137 AD2d 213, 217, *appeal dismissed* 72 NY2d 952).

Similarly, proof regarding the editorial slant of the "Surgical Scorecards" segment does not raise an issue of fact with respect to defendant's alleged gross irresponsibility. In opposition to the motion, plaintiff submitted a handwritten note allegedly containing the following list of instructions from the producer of the "Surgical Scorecards" segment regarding the manner in which the hidden-camera interview was to be conducted:

"push people
be more persistent
goad them
take risks
be more specific
get them to lie
up the ante
go for the big lie
set them up."

Even if that note reflects the subjective intentions of defendant's employees, as plaintiff alleges, it does not demonstrate that defendant acted in a grossly irresponsible manner. That "standard is capable of being met by wholly objective proof, without the need to resort to an exploration of the

defendant's subjective mental state" (*Karaduman v Newsday, Inc., supra* at 545). The objective proof concerning the investigation, preparation and broadcast of the "Surgical Scorecards" segment supports the conclusion that defendant employed reasonable methods to insure the accuracy of its report (*see, Chapadeau v Utica Observer-Dispatch, supra* at 200), and evidence of defendant's subjective intentions does not alter that conclusion. Indeed, plaintiff does not allege that defendant successfully carried out its program to "goad" him into telling "the big lie." On the contrary, plaintiff contends that his responses during the undercover interview were wholly truthful and accurate. Thus, defendant is entitled to summary judgment dismissing the defamation cause of action on the additional ground that it established that its conduct was not grossly irresponsible and plaintiff failed to raise a triable issue of fact.

Defendant is also entitled to summary judgment dismissing the intentional tort cause of action. That cause of action alleges that defendant engaged in acts of deception to induce him into participating in the hidden-camera interview and edited the interview to portray him as deceptive, untruthful, unethical, incompetent and untrustworthy. Regardless of the label plaintiff places upon it, however, this cause of action is indistinguishable from the defamation cause of action (*see, Williams v Arpie,* 56 AD2d 689, 690, *affd* 44 NY2d 689). Plaintiff alleges in the intentional tort cause of action that defendant engaged in actionable conduct by deceiving him and editing the program unfairly. Any injury to plaintiff, however, is the result of the allegedly unfavorable portrayal of him in the broadcast, not of defendant's behind-the-scenes deception and editing. "[U]nlike most torts, defamation is defined in terms of the injury, damage to reputation, and not in terms of the manner in which the injury is accomplished" (*Morrison v National Broadcasting Co.,* 19 NY2d 453, 458). In the second amended complaint, plaintiff seeks damages only for injury to his reputation (*cf., Singer v Jefferies & Co.,* 160 AD2d 216, 218), and on appeal offers no rationale supporting the survival of the intentional tort cause of action as a separate cause of action. We conclude that the intentional tort cause of action should be dismissed as duplicative of the defamation cause of action.

Accordingly, the order should be reversed, defendant's motion granted and the second amended complaint dismissed.

HAYES, SCUDDER, GORSKI and LAWTON, JJ., concur.

Ordered that the order so appealed from be and the same hereby is unanimously reversed, on the law, without costs, the

motion is granted and the second amended complaint is dismissed.