*565 OPINION OF THE COURT
David Mahoney, J.
Defendants move for summary judgment dismissing the complaint in this defamation action in which plaintiff contends that he was defamed by an article that appeared in The Buffalo News on November 13, 1994. Defendant Murray B. Light was the editor of the paper at that time and the author of the article was defendant Dan Herbeck. In support of the motion, defendants have submitted an attorney’s affidavit with voluminous exhibits, an affidavit from Herbeck, and an affidavit from Stan Evans, who was the assistant managing editor at the time of the article. In opposition to the motion, there is an affidavit from plaintiff.
This case involves, in the context of a much broader series of news articles, the use of the word “rival” to describe plaintiff, as an alleged rival of Danyl “Reese” Johnson, who had been the reputed right-hand man and criminal accomplice of Donald “Sly” Green, another notorious East Side-based criminal.
The court has reviewed the voluminous exhibits and all of the supporting papers and concludes that defendants are entitled to summary judgment dismissing the complaint. The court believes that such a decision is required in light of the protections that the First Amendment to the United States Constitution provides to the press.
The article in question starts on page 1 of the Sunday, November 13, 1994, edition of The Buffalo News. The title of the article is “Suspect Described as City’s Deadliest.” The subtitle of the article is “Johnson Accused of Killing Eight, Trying to Slay 25 in Reign of Terror.” The article starts by describing Danyl “Reese” Johnson as, according to “some police officers,” the deadliest criminal in the history of Buffalo. Johnson was accused of killing 8 people and attempting to murder 25 others. The article was prepared in anticipation of his upcoming trial. The article continued on page A-6 of the newspaper, where the title was “Police Classify Man as Remorseless ‘stone killer.’ ” The article quotes police officers as describing Johnson as a “dangerous individual,” while quoting Johnson’s court-appointed lawyer as believing the police and prosecutors to be on a vendetta against Johnson, charging him with every unsolved crime in the City of Buffalo. The article then goes on to describe Johnson’s criminal history and the various allegations contained in court documents. A sidebar article on the same page is entitled “A Trail of Death.” The sidebar article *566 contains 18 “bullet” points listing the charges and accusations against Johnson. The 15th point identifies the following accusation against Johnson: “Offering $100,000 for the killing of Buffalo rival, Sid Cottrell and two other people, in May 1992. The slayings never occurred.” In the context of that item, plaintiff bases his lawsuit on the use of the word “rival.”
Defendants contend that the article was prompted by the federal prosecutor’s filing of an indictment and a notice of supporting evidence (referred to as the “bad acts list”) against Johnson. Herbeck had written extensively about the criminal activities and the purported “feud” between Green and Johnson and the family of plaintiff. In fact, plaintiffs son, Larnell Cottrell, was murdered in 1988 in what defendants assert was a killing over a gambling-related dispute.
Herbeck avers in his affidavit that he learned of the plaintiff, whom his police sources identified as a “street numbers,” that is, illegal gambling operator on Buffalo’s East Side, from his days as a reporter on police activities. Defendants have submitted voluminous Buffalo Police Department investigatory reports and witness statements regarding the activity of plaintiff as a gambling operator and plaintiff’s alleged gambling behavior, and defendants assert that the bad acts list provides that Johnson attempted the murders of plaintiff and two of his associates so that he could take over the numbers operation in Buffalo. Thus, defendants argue that the use of the word “rival” explains Johnson’s attempted aggression toward plaintiff and his associates in the context of his intent to control the numbers racket in Buffalo.
Herbeck further avers that, before he published the article, he asked for and received from the federal prosecutor specific assurances that the documents that he was reviewing accurately reflected charges and evidence the United States Attorney believed to be truthful. He expressly addressed with the prosecutor the propriety of characterizing plaintiff as a “rival” and Herbeck believed that his article was true when he wrote it.
Plaintiffs position is that he has led a law-abiding life and that the use of the word “rival” suggests that he was engaged in criminal activity equal to that of Johnson and Green. In fact, plaintiff contends that the police investigatory reports refer to other members of his family, particularly his sons, regarding their involvement in the “numbers racket” but that there are no direct references to plaintiff himself.
This court is well aware of the voluminous case law regarding news media defamation, beginning with the Supreme Court de *567 cisión in 1964 in New York Times Co. v Sullivan (376 US 254 [1964]). There, the Court held that a “public figure” libel plaintiff cannot constitutionally prevail against a news media publisher of an allegedly defamatory statement unless he establishes by clear and convincing evidence that the statement was made with “actual malice.” In Gertz v Robert Welch, Inc. (418 US 323 [1974]), decided in 1974, the Court extended certain minimum constitutional safeguards to “private figure” cases and abolished the common-law rule of strict liability for libel.
The New York Court of Appeals established the “private figure” standard of fault governing liability in Chapadeau v Utica Observer-Dispatch (38 NY2d 196 [1975]). For purposes of this case, the court will consider plaintiff to be a private figure. The standard in New York requires private figure libel plaintiffs involved in matters of public interest and concern to prove that the publisher of the allegedly defamatory statement “acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties” (Chapadeau, supra at 199).
The court believes it is significant that the Court of Appeals decisions in this area have been extremely favorable to the news media. In Immuno AG. v Moor-Jankowskji (77 NY2d 235, 249 [1991], cert denied 500 US 954 [1991]), the Court stated that New York is “a cultural center for the Nation, [and] has long provided a hospitable climate for the free exchange of ideas.” The Court further cited article I, § 8 of the New York Constitution as reflecting the deliberate choice of the New York State Constitutional Convention not to follow the language of the First Amendment, ratified 30 years earlier, but instead “to set forth our basic democratic ideal of liberty of the press and strong affirmative terms.” (Id.)
The Court of Appeals further has stated that courts must not be reluctant to apply the ordinary rules governing summary judgment in libel cases, since the threat of being put to the defense in the lawsuit may be as chilling as the exercise of the First Amendment freedoms as fear of outcome of the lawsuit itself (Karaduman v Newsday, Inc., 51 NY2d 531, 545 [1980]). Significantly, for this court, there is substantial case law setting forth the proposition that summary judgment is the rule, not the exception, in defamation cases (see, e.g., Balderman v American Broadcasting Cos., 292 AD2d 67 [2002]).
Applying the general rules to the facts of this case, the court concludes that defendants are entitled to summary judgment. *568 The court does not believe that plaintiff has established that the allegedly defamatory statement was made in a “grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.” (Chapadeau at 199.) Certainly, the criminal activities of Johnson and Green were a matter of public concern and Herbeck had long covered those activities and the persons behind them. Herbeck reviewed voluminous police reports and spoke to federal prosecutors who had prepared the indictment. The court emphasizes that the standard is “grossly irresponsible” behavior, which the court believes is an extremely high bar for a plaintiff to meet. Although the court has concerns about the behavior of the reporter and the newspaper, it does not believe that said behavior meets the standard of gross irresponsibility.
Thus, the court believes that defendants are entitled to summary judgment dismissing the complaint.