# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| INVICTUS GLOBAL MANAGEMENT, LLC, INVICTUS SPECIAL SITUATIONS I GP, and AMIT PATEL, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. N24C-07-306 KMM |
| v. | ) ) ) | |
| CORBIN CAPITAL PARTNERS, L.P., GATEWOOD CAPITAL PARTNERS LLC, TREO VITUS GP, LLC, and TREO ASSET MANAGEMENT, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

Submitted: July 14, 2025
Decided: August 21, 2025

## MEMORANDUM OPINION AND ORDER

*Corbin Capital Partners L.P.'s Motion to Dismiss or Stay – **GRANTED**.*
*Gatewood Capital Partners LLC's Motion to Dismiss or Stay – **GRANTED**.*
*TREO Vitus GP, LLC and TREO Asset Management LLC's Motion for Partial Dismissal – **DENIED**.*

Brian E. Farnan (argued), Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Thomas A. Clare (argued), Kathryn Humphrey, Camilla J. Hundley, CLARE LOCKE LLP, Alexandria, Virginia, *Attorneys for Plaintiffs Invictus Global Management, LLC, Invictus Special Situations I GP, and Amit Patel.*

Michael A. Barlow, Shannon Doughty, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Taylor L. Jones, Cory D. Struble (argued), Rachel E. Epstein, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for defendant Corbin Capital Partners, L.P.*

Steven L. Caponi (argued), Matthew B. Goeller, K&L GATES LLP, Wilmington, Delaware; Thomas J. Smith, K&L GATES LLP, Pittsburgh, Pennsylvania; Eric P.

Schroeder (argued), Damon J. Whitaker, BRYAN CAVE LEIGHTON PAISNER LLP, Atlanta, Georgia; *Attorneys for defendant Gatewood Capital Partners LLC*.

Ronald N. Brown, III, Aaron S. Applebaum (argued), DLA PIPER LLP (US), Wilmington, Delaware; *Attorneys for TREO Vitus GP and TREO Asset Management, LLC*.

**Miller, J.**

# I. INTRODUCTION

Amit Patel ("Patel"), an experienced investment professional, co-owns and controls Invictus Global Management, LLC ("Invictus Global") and Invictus Special Situations I GP ("Invictus GP" and with Invictus Global, "Invictus"). In 2020, Invictus launched its first private equity fund, Invictus Special Situations Masters I, L.P. (the "Fund"), focusing on distressed debt, bankruptcy, and litigation finance. Invictus managed the Fund and was responsible for overseeing its investments.

Corbin Capital Partners, L.P. ("Corbin") and Gatewood Capital Partners LLC ("Gatewood") are the controlling limited partners of the Fund.

In September 2023, Corbin and Gatewood exercised their contractual right under the partnership agreement's "for any reason and without cause" provision to remove Invictus Global and Invictus GP from the Fund's management and appointed TREO Vitus GP, LLC ("TREO GP") and TREO Asset Management, LLC ("TREO Management" and with TREO GP, "TREO"), in their place.

Following Invictus' removal, articles reporting on the managerial change were published by With Intelligence, Alternatives Watch, and The Wall Street Journal. The articles contained statements by Corbin and Gatewood describing the bases for Invictus' removal, including its "utter disregard for its fiduciary

1

obligations" and "operational conduct not befitting a fiduciary."[1]  Plaintiffs claim that these statements are defamatory.

Corbin filed a Motion to Dismiss on Grounds of Collateral Estoppel and for Failure to State a Claim or, alternatively for a Stay.[2]  Gatewood filed a Motion to Dismiss, or, alternatively for a Stay.[3]

Because Corbin abandoned its collateral estoppel argument at the hearing on the motions, the Court does not reach the merits of this argument.

Reviewing the challenged statements in the context of the entire publications, the Court finds that the statements are not provable facts, and the articles do not imply that there are undisclosed facts upon which the statements are based. Therefore, the statements are constitutionally protected and non-actionable opinions. Corbin's and Gatewood's motions to dismiss are GRANTED.  Accordingly, the Court does not reach the remainder of the parties' arguments.

After the articles were published, TREO wrote to the Fund's limited partners, describing the status of its investigation into Invictus' transition to the new Fund

---

[1] D.I. 34, Opening Brief in Support of Defendant Gatewood Capital Partners LLC's Motion to Dismiss or, in the Alternative, to Stay ("Gatewood MTD"), Ex. A, The Wall Street Journal ("WSJ") article, Ex. B, With Intelligence ("WI") article.  D.I. 36, Corbin Capital Partners, L.P.'s Opening Brief in Support of its Motion to Dismiss ("Corbin MTD"), Transmittal Affidavit of Shannon M. Doughty ("Doughty Aff."), Ex. F, Alternatives Watch ("AW") article.
[2] *See generally* Corbin MTD.
[3] *See generally* Gatewood MTD.

manager and Invictus causing the Fund to enter into certain prohibited transactions. Plaintiffs assert that the letter contains defamatory statements.

TREO filed a Partial Motion to Dismiss based on improper claim splitting. TREO argues that the claim asserted against it in this action is based on the same factual predicate, and involve the same parties, as claims pending against it in the Court of Chancery. Therefore, the claim here should have been asserted in that action and accordingly, this action must be dismissed.

The problem with TREO's position is that the Court of Chancery does not have jurisdiction over defamation claims. TREO urges this Court to dismiss the claim anyway because the Court of Chancery can exercise jurisdiction under the clean-up doctrine. While it is true that the Court of Chancery may exercise its discretion to extend jurisdiction over a defamation claim, this Court will not dismiss a claim with the expectation of how another court should exercise its discretion. TREO's motion for partial dismissal is DENIED.

## II. FACTUAL BACKGROUND[4]

### A. *The Fund*

#### 1. *Creation of the Fund*

Patel is an asset manager with over 20 years of experience in distressed credit and special situations investments.[5] While working as a Portfolio Manager, Patel

---

[4] The facts are derived from the allegations in the complaint.
[5] D.I. 1, Complaint ("Compl."), ¶ 17.

met Cindy Chen Delano ("Delano"), a bankruptcy and restructuring attorney.[6] Patel and Delano founded investment firms Invictus Global and Invictus GP.[7]

In 2020, Invictus launched the Fund, with Invictus GP serving as the General Partner of the limited partnership and Invictus Global serving as its Management Company.[8] The Fund invests "in niche, non-correlated litigation-oriented special situations spanning across the distressed debt, bankruptcy, and litigation finance sectors."[9]

### 2. *Corbin and Gatewood become anchor and the largest investors in the Fund.*

Being first-time investment managers, Invictus sought anchor investors. To that end, it was introduced to Gatewood. Gatewood is a private equity firm that focuses on emerging investment managers. It committed to investing $25 million in the Fund and represented that it would seek to raise another $150-$200 million.[10] Gatewood negotiated beneficial terms for itself, including "a 15% interest in the Fund's revenues . . . reduced fees, preferential rights, and the ability to exercise plurality voting power."[11]

---

[6] Compl., ¶ 18.
[7] *Id.*, ¶¶ 19–20.
[8] *Id.*, ¶¶ 21–22.
[9] *Id.*, ¶ 2.
[10] *Id.*, ¶¶ 24–25.
[11] *Id.*, ¶¶ 28–29.

Corbin is a "fund of funds" "that solicits investments to be funneled into a collection of funds managed by firms like Invictus."[12]  Corbin had an existing relationship with Invictus through a sub-advisory agreement under which Invictus could earn a performance fee, instead of the industry-standard management fee.[13] This relationship proved successful, and because of Patel's talent for investing, Corbin agreed to invest in the Fund.[14]  Corbin also became an anchor investor, committing $25 million in exchange for preferential terms, including sharing in the investment success and revenues of the Fund.[15]

Corbin and Gatewood are the Fund's largest limited partners.[16]

### 3.    *The limited partnership agreement's removal provisions*

Under the Fund's First Amended and Restated Limited Partnership Agreement (the "LPA"), the partnership was to be managed by the General Partner—Invictus GP.[17]  Under the Investment Management Agreement, Invictus Global was named the Management Company for the Fund.[18]

The LPA contains two provisions for the removal of the General Partner. Under Section 3.08(a), the General Partner may be removed for a "Cause Event" by

---

[12] *Id.*, ¶ 30.
[13] *Id.*, ¶ 31.
[14] *Id.*, ¶¶ 31–34.
[15] *Id.*, ¶¶ 35, 37.
[16] Compl., ¶ 38.
[17] LPA, Art. III, § 3.01, D.I. 54, Ex. A.  The parties entered into the governing agreements on August 25, 2020. Compl., ¶ 36.
[18] D.I. 54, Investment Management Agreement, Ex. B.

consent of 66⅔% of the Limited Partners.[19]  If removed for a Cause Event, the Special Limited Partner (an Invictus entity) would be entitled to 100% of certain Carried Interest Distributions and 50% of other Carried Interest Distributions.[20]

Under Section 3.08(b), the General Partner can be removed "for any reason and without cause" by consent of 66⅔% of the Limited Partners.  Upon removal under this subsection, the Special Limited Partner would be entitled to receive 100% of all of the Carried Interest Distributions.[21]

If the General Partner is removed under either Section 3.08(a) or (b), the Investment Management Agreement immediately terminates.[22]

### 4. *Patel successfully manages the Fund*.

Patel "is an expert in distressed investments."[23]  Under Patel's leadership, "Invictus skillfully managed the Fund for three years."[24]  The Patel-led investments "were very profitable with expected profits calculated at a 3-5 times multiple of

---

[19] A Cause Event is defined as "a determination by a court of governmental body of competent jurisdiction . . . that the General Partner, or the Management Company has engaged in Disabling Conduct . . . in connection with the management and operating of the Fund." "Disabling Conduct" is defined to include "fraud, gross negligence, willful misconduct . . . a material breach of . . . fiduciary duties to the Partnership or a material breach of [the LPA] or the Investment Management Agreement . . . ." D.I. 54, LPA, App. A, Ex. A.

[20] LPA, Art. III, § 3.08(a), D.I. 54, Ex. A.  Capitalized terms not otherwise defined have the meaning ascribed to them in the LPA.

[21] LPA, Art. III, § 3.08(b), D.I. 54, Ex. A; Compl., ¶ 68.

[22] LPA, Art. III, § 3.08(c), D.I. 54, Ex. A.

[23] Compl., ¶ 17.

[24] *Id*., ¶ 44.

invested capital."[25]  "[T]he Fund generated significant, above-market returns for the benefit of all Fund limited partners . . . quarter after quarter."[26]

Under Patel's leadership, Invictus made over 40 investments in the first three years, "20 of which ha[d] already been realized, generating $22.5 million of profits and a 42% internal rate of return, which is significantly higher than the industry average, with no material realized losses, including multiple investments with 100% or more profits."[27]

**B.**   ***Disputes arise between Invictus and Corbin and Gatewood.***

After an Invictus-placed investment under the sub-advisory agreement turned a profit in 2023, Invictus attempted to collect its $1.5 million performance fee.[28] Corbin refused to pay.[29]   When Invictus demanded payment, "Corbin's representative threatened that 'I'm sure [Invictus] would like . . . to remain in its position as GP of its only fund.'"[30]

Seeking to collect its fee, Invictus filed an action in June 2023 against Corbin in the Supreme Court of the State of New York for breach of contract, bad faith, and

---

[25] Compl., ¶ 43.
[26] *Id.*
[27] *Id.*, ¶ 44.
[28] *Id.*, ¶ 47.
[29] *Id.*
[30] *Id.*, ¶ 48.

willful misconduct.[31]  Corbin's lawyer responded by threating to "'destroy [Mr. Patel's] career" noting that he would "'kill for Corbin.'"[32]

Invictus had a separate issue with Gatewood.  Instead of raising capital for the Fund as promised, Gatewood focused on raising capital for its own investments.[33]  Ultimately, Gatewood raised no funds beyond its initial commitment.[34]  Invictus "stood up" to Gatewood for breaking its promise.[35]

## C.    *The Fund is sanctioned and sued.*

Under Patel's management, the Fund was active in several chapter 11 bankruptcy cases, including Latam Airlines and Tuesday Morning.[36]  The Fund was on the *ad hoc* trade creditors committee in the Tuesday Morning bankruptcy.  In 2020, the Texas bankruptcy court found that the committee had spread false or

---

[31] Compl., ¶ 49; Corbin MTD, Doughty Aff., Ex. G.  The Court may consider the New York complaint because the complaint in this action relies on the allegations made in that action.  *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996); *Doe 30's Mother v. Bradley*, 58 A.3d 429, 443 (Del. Super. 2012).  The Court also takes judicial notice of the proceedings, but only to the extent a fact is undisputed.  *See* D.R.E. 201; *see also MidFirst Bank v. Mullan*e, 2022 WL 4460810, at *6, n.3 (Del. Super. Sept. 26, 2022).

Subsequent to oral argument on the motions, the New York Court granted Corbin summary judgment.  The court found that Corbin properly terminated the sub-advisory agreement, a fee was not earned, and Corbin did not act in bad faith.  The court dismissed the complaint.
[32] Compl., ¶ 49.
[33] *Id*., ¶¶ 51–53.
[34] *Id*., ¶ 40.
[35] *Id*., ¶ 50.
[36] Gatewood attached to its motion various articles from Bloomberg, AML, and Law360 reporting on litigation and other matters relating to Invictus.  These matters are outside the scope of the complaint and the documents relied on therein.  The Court did not consider any documents in Gatewood's Ex. C in deciding the motions.

misleading information to creditors in connection with the committee's effort to persuade the creditors' vote.[37]  The bankruptcy court sanctioned the *ad hoc* committee members, including the Fund.[38]

Invictus explained the "so-called 'sanctions'" as the committee's effort to "advocate for a higher interest rate owed to Tuesday Morning's creditors—i.e., to ensure a higher rate of return on Invictus's investment in the bankruptcy," but the applicable interest rate was "accidently misstated" on the group's webpage.[39]

The *ad hoc* committee settled the debtors' sanctions motion "without any monetary or other penalties," and Invictus "made a 35.2% internal rate of return on this investment."[40]

In 2022, investment banker Jefferies Financial Group[41] sued the Fund for allegedly breaching an agreement to buy $5 million in Latam Airlines creditor claims.[42]  Invictus denied that an agreement had been reached.[43]

**D.    *Corbin and Gatewood remove Invictus as Fund manager.***

On September 29, 2023, Corbin and Gatewood "unilaterally and without notice" removed Invictus as the General Partner and Management Company on a

---

[37] Compl., ¶ 78.
[38] *Id*.
[39] *Id*.
[40] *Id*; Gatewood MTD, Ex. A, WSJ article.
[41] Gatewood MTD, Ex. A, WSJ article.
[42] *Id*.
[43] *Id*.

"no-fault" basis.[44]  Given Invictus' successful management of the Fund for three years, "the removal simply lacked a commercial rationale"[45] and was a pretext for retaliation by Corbin and Gatewood for Invictus enforcing its rights against them.[46]

Corbin and Gatewood appointed TREO GP as the Fund's General Partner and TREO Management as the Management Company.[47]

**E.**     *News articles report on Invictus' removal.*

On October 19, 2023, publication With Intelligence issued an article titled "*Corbin, Gatewood cut ties with special sits manager Invictus.*"[48]  The article stated:

> Sources said the vote to remove [Invictus] as fund manager[] came after allegations of consistent material breaches of investment guidelines over an 18 month span that included, among other claims, a failure to meet reporting requirements.
>
> "***After witnessing a sustained period of worsening investment and operational conduct not befitting a fiduciary***, Corbin and Gatewood, representing over 80% of investor capital, exercised their contractual right to remove Invictus as the general partner and investment manager of the fund," a Corbin spokesperson told With [Intelligence].[49]
>
> ***
>
> "Gatewood and Corbin acted for their own interests, without regard to the interests of the fund or minority investors. They used a 'no fault' provision to remove Invictus, for their own personal reasons. This was

---

[44] Compl., ¶ 55.  There are no allegations that notice was required under the LPA or that Corbin and Gatewood did not have authority to effectuate the removal.

[45] *Id.*, ¶ 57.

[46] *Id.*, ¶ 58.

[47] *Id.*, ¶ 59.

[48] *Id.*, ¶ 77; Gatewood MTD, Ex. B, WI article.

[49] *Id.*, ¶ 71 (emphasis in the complaint).

done without consultation with or notice to other minority limited partners," Invictus CIO Patel told With.

***

Earlier this year, Invictus filed a lawsuit against Corbin, alleging that Corbin had not paid outstanding performance fees amounting to roughly $1.5m. The case is currently in litigation.

Invictus is also in litigation after being sued by trading partner Jefferies Financial Group for allegedly backing out of a contract and failing to follow through on a 2021 agreement to buy $5m in creditor claims on bankrupt airline LatAm Airlines Group, according to reports from Bloomberg.

Invictus' ongoing lawsuit with Jefferies is said to have factored into Corbin and Gatewood's decision.[50]

On November 20, 2023, The Wall Street Journal published an article titled

*"Distressed-Debt Manager Invictus Loses Control of Flagship Fund After Battle*

*With Top Investors.*"[51]  The article stated:

A new distressed-debt manager lost control of its flagship fund after top investors ousted it for business tactics they considered too aggressive, including conduct during a chapter 11 bankruptcy that resulted in court sanctions against the fund, according to people familiar with the matter.

Austin, Texas-based Invictus Global Management has run a flagship $100 million distressed-debt fund that invests in struggling or bankrupt companies. It has been active in several major chapter 11 and litigation finance cases in the last four years, including the bankruptcies of Aeromexico, Latam Airlines and discount retailer Tuesday Morning.

The fund's two largest investors, Corbin Capital Partners and Gatewood Capital Partners, voted to remove Invictus as fund manager

---

[50] Gatewood MTD, Ex. B, WI article.
[51] Compl., ¶ 77; Gatewood MTD, Ex. A, WSJ article.

in September as Invictus faced litigation tied to its actions on Wall Street, according to people familiar with Corbin's and Gatewood's thinking.

Invictus was sanctioned by a Texas bankruptcy court in 2020 for spreading "false or misleading information" to creditors of Tuesday Morning, a bankrupt retailer that it tried and failed to acquire. Last year, the investment bank Jeffries Financial Group sued Invictus after Invictus agreed to buy $5 million of bankruptcy claims from the bank but backed out of the deal as the market value of the claims decreased, the investment bank said.

Invictus said in a statement that its investment in Tuesday Morning resulted in a more than 35% return for the fund and that it was able to reach a settlement with the company that resolved the sanctions "without any monetary or other penalties." It also said the Jefferies suit has no merit because "there was never a trade, nor has Jefferies provided any evidence of one."

In a statement to The Wall Street Journal, Corbin and Gatewood said they pulled the plug on Invictus's managers because of the company's failing investment strategy and "operational conduct not befitting a fiduciary."

Corbin and Gatewood also have sued Invictus Global Management for retaining about $16 million that they say belongs to the fund since the ouster. They filed a restraining order against Invictus earlier this month, and a judge agreed to temporarily freeze one of Invictus's bank accounts until the dispute is resolved.

Invictus's former managers said they have been victims of fraud perpetuated by Corbin and Gatewood.

In a statement, Invictus said that it plans to file a lawsuit Monday against Gatewood for "exploitative tactics" and for misleading the fund about its ability to fundraise on Invictus's behalf.

"When Invictus stood up to Gatewood for its failures, Gatewood colluded with Corbin Capital Management to remove Invictus as fund manager despite its superlative returns," a spokesman for Invictus said.

"It is unfortunate that it must now use litigation to protect itself from predatory seed investors like Gatewood and Corbin."

A representative for Gatewood said that it "has successfully partnered with many emerging managers in launching their inaugural funds" and that Invictus's "utter disregard of its fiduciary obligations" compelled it to remove the manager. A representative for Corbin said that said it [sic] and Gatewood exercised their contractual rights to remove Invictus as the fund's manager.

***

Corbin's and Gatewood's concerns about Invictus's management style grew as it faced a growing number of lawsuits over the past four years, the people familiar with the funds' thinking said.

***

Before the ouster, Invictus and Corbin were fighting with one another for months over millions of dollars in fees that Invictus says it is owed by Corbin.

In court papers, Corbin has criticized Invictus's performance since 2019, saying Invictus is an "unskilled investor who lost substantial sums of its investors' money." Corbin also has said it isn't required to pay some of the fees that Invictus has demanded because that would "require ignoring losses incurred by every other investment" it made.[52]

On December 1, 2023, the publication Alternatives Watch issued an article titled "*Seeds of discontent: A cautionary tale for investors, emerging managers*."[53] After detailing Patel's prior success, the article described the various lawsuits between Invictus and Corbin and Invictus and Gatewood. Under the subheading, "*Corbin claims unorthodox behavior of Invictus*," Corbin said that Invictus was

---

[52] Gatewood MTD, Ex. B, WI article.
[53] Corbin MTD, Ex. F, AW article.

13

removed from the Fund's management due to "operational conduct not befitting a fiduciary."[54] The article contained Invictus' comments in response.

## F. *TREO communicates with the limited partners.*

In December 2023, TREO sent a letter to the Fund's limited partners stating:[55]

> Notwithstanding that the removal was effected under the no fault provisions of the LPA, TREO understands that Corbin and Gatewood, acting as fiduciaries for their own investors, took the actions to remove [Invictus] in response to their concerns regarding [Invictus] having breached multiple material provisions of the LPA and their side letters.

> From the Fund's records currently in TREO's possession, which remain incomplete and still subject to ongoing investigation, TREO has identified, among other things, the following: i) the failure of the [Invictus] founders to fund over 25% of their capital commitments to the Fund; ii) [Invictus] having caused the Fund to make investments that breached Fund concentration limits and which resulted in material losses; and iii) [Invictus] having caused the Fund to enter into multiple conflicted transactions without required notice to or consent of the advisory committee.

> TREO's investigation has identified $9.2 million of cash related to these investments that was not accounted for in the Fund's records, and which was not held in bank accounts of the Fund or its investment vehicles, but instead was held in [Invictus]'s own bank accounts.[56]

---

[54] Corbin MTD, Ex. F, AW article.
[55] Compl., ¶¶ 90, 147.
[56] *Id*., ¶ 147.

14

**G.** *The Fund sues Patel, Delano, and Invictus in the Court of Chancery.*

On October 30, 2023, the Fund sued Invictus, Delano, and Patel in the Court of Chancery, asserting that after Invictus' removal from management, the defendants failed to turn over the company's books and records and improperly retained millions of dollars belonging to the Fund.

On April 17, 2024, the Court of Chancery ruled that the defendants "improperly withheld for months vast quantities of information to which TREO and the Fund were unequivocally and contractually entitled."[57]

On August 26, 2024, the Court of Chancery ruled on the Fund's claim relating to improperly retained funds. The court found that the defendants "seem to have determined to withhold millions of dollars of the Fund's money because Defendants thought they might need millions of dollars later or perhaps because they believed withholding nearly $10 million of the Fund's money would give them leverage in any follow-on dispute."[58] The court further found that the defendants had retained Fund money as a reserve, without contractual authority to do so, and at that point, had improperly withheld the money for over a year.[59]

---

[57] D.I. 33, TREO Defendants' Partial Motion to Dismiss ("TREO MTD"), Ex. B, Court of Chancery transcript of Partial Bench Ruling on Cross-Motions for Summary Judgement, August 26, 2024 ("Aug. 26 Tr."), pp. 22–23.
[58] *Id.*, p. 20.
[59] *Id.*, p. 21.

15

In addressing the defendants' assertion of equitable set-off, the court found that even if this equitable remedy applied, the defendants were not entitled to any relief because their conduct "seem[ed] far removed from reasonable business expectations, much less equity. Frankly, it seem[ed] more akin to schoolyard rules, at best."[60]

At the time of oral argument on the motions to dismiss, additional matters remained pending in the Court of Chancery, including defendants' counterclaims. On May 23, 2025, the Court of Chancery ruled on whether the Fund's affirmative defense under ERISA barred defendants' (Patel and Invictus) counterclaim for advancement under the LPA and the Investment Management Agreement. The court found that ERISA[61] prohibits "the use of plan assets by a plan fiduciary for the benefit or interest of the fiduciary that are not properly incurred in the performance of the fiduciary's duties to the fund…"[62] The court ruled:

> It would, frankly, stretch credulity to the breaking point to argue that defendants' misappropriation of Fund assets by improperly withholding nearly $10 million of the Fund's money and vast quantities of information to which the Fund was unequivocally and contractually

---

[60] *Id.*, p. 24.

[61] There is no dispute that ERISA funds were invested in the Fund and that Patel and Delano were ERISA fiduciaries. D.I. 59, Court of Chancery May 23, 2025 transcript of Ruling of the Court on Plaintiff's Motion for Summary Judgement and Defendants' Motion for Enforcement ("May 23 Tr."), p. 10.

[62] *Id.*, p. 20.

entitled would not amount to a breach of defendants' ERISA fiduciary duties.[63]

The court granted the Fund's motion for summary judgment and denied defendants' claim for advancement.

## H. *The complaint's allegations of defamation*

### 1. *Defamation per se against Corbin and Gatewood – The Wall Street Journal article (Count I)*

In The Wall Street Journal article, the bankruptcy court's sanctioning the Fund is cited as a reason for Invictus' removal from the Fund's management. Explaining the circumstances of the "so-called" sanctions, plaintiffs assert that the sanctions were not a basis for Invictus' removal because the removal was "no-fault," and the sanctions did not cause Corbin to withhold its second investment in the Fund. Rather, Corbin and Gatewood used the "sanctions" as an opportunity to spread their false narrative to justify Invictus' removal.[64]

Corbin and Gatewood stated that Invictus was removed due to a "failing investment strategy and ***conduct not befitting a fiduciary***" and Gatewood further stated that Invictus' removal was due to an "***utter disregard of its fiduciary obligations***."[65]  Plaintiffs contend that these statements "can only be understood as

---

[63] D.I. 59, May 23 Tr., p. 20.  After the Court of Chancery's May 23 ruling, the parties filed supplemental letters arguing the import of the court's ruling on the pending motions in this Court. D.I. 60, 61.
[64] Compl., ¶ 79.
[65] *Id*., ¶¶ 80–81 (emphasis added).

breaches of fiduciary duties."[66] Plaintiffs assert that these are false statements of fact because Invictus was removed on a no-fault basis (not for breach of fiduciary duties), and plaintiffs never breached their fiduciary duties.[67] Plaintiffs further support this allegation by asserting that neither Corbin nor Gatewood never complained to Invictus about its services.[68]

Plaintiffs further challenge Corbin's statement that Invictus' investment strategy was "failing" because, under plaintiffs' management, the Fund enjoyed a 45% internal rate of return with no material realized losses and profits of 100% or more on many investments.[69] It was because of these results, plaintiffs assert, that Corbin and Gatewood used the no-fault removal provision, as there was no basis to remove Invictus for cause.[70]

2. *Defamation by implication against Corbin - With Intelligence and Alternatives Watch articles (Count II)*

In the With Intelligence and Alternatives Watch articles, Corbin stated: "After witnessing a sustained period of worsening investment and ***operational conduct not befitting a fiduciary***," Corbin and Gatewood exercised their contractual right to remove Invictus as the General Partner and Management Company.[71] Plaintiffs

---

[66] Compl., ¶ 71.
[67] *Id.*, ¶ 72.
[68] *Id.*, ¶ 82.
[69] *Id.*, ¶¶ 73–75.
[70] *Id.*, ¶ 76.
[71] *Id.*, ¶ 132.

assert that the statement implies that Invictus was removed after discovery of misconduct.[72] This is a false statement of fact, plaintiffs claim, because Invictus was removed for "no-fault" (which Corbin failed to disclose), and Invictus never engaged in conduct unbefitting a fiduciary.

### 3. *Corbin's and Gatewood's actual malice*

Plaintiffs allege that Corbin and Gatewood knowingly or recklessly disregarded the truth because of their extreme ill will towards plaintiffs. This is shown by "Corbin's declared agenda to 'destroy' and 'kill' Invictus."[73] Further, Corbin and Gatewood ignored the reliable information in the Fund's books and records, which showed great success, not a failing investment strategy.[74]

Corbin and Gatewood manufactured the false narrative to avoid paying Invictus fees earned under the governing documents. Corbin refused to pay the amount due under the sub-advisory agreement, and it and Gatewood wanted to avoid paying money due under the LPA's no-fault removal provision.[75]

Corbin's and Gatewood' actual malice is also shown by their refusal to retract the statements. In January 2024, plaintiffs' counsel wrote to these defendants, showing the statements to be false and defamatory because of the Fund's significant

---

[72] Compl., ¶ 133 (emphasis added).
[73] *Id.*, ¶ 83.
[74] *Id.*, ¶ 84.
[75] *Id.*, ¶¶ 85–86.

returns and stating that there was no basis for claims of mismanagement or breaches of fiduciary duties.[76] Plaintiffs demanded a retraction. No retraction was made.

## I.    *TREO's defamatory statements*

In its communication with the limited partners, TREO is alleged to have defamed plaintiffs by asserting that Patel failed to make his required investment, Invictus made investments that breached the Fund's concentration limits and engaged in multiple conflicted transactions.[77] Plaintiffs allege that these statements are false because Patel made his required contribution, and plaintiffs never caused the Fund to engage in such transactions.

TREO also defamed plaintiffs by claiming that Invictus rebuffed TREO's efforts at a smooth transition, which TREO knew was false.[78]

TREO next defamed plaintiffs by asserting that plaintiffs wrongfully withheld over $9 million of the Fund's money. Invictus had told TREO that the funds were being retained under Invictus' indemnity and advancement rights.[79]

Finally, TREO defamed plaintiffs by telling the limited partners that TREO was investigating the status of various investments and liabilities incurred by

---

[76] Compl., ¶¶ 87–89.
[77] *Id.*, ¶ 90.
[78] *Id.*, ¶ 92.
[79] *Id.*, ¶ 95.

Invictus. Invictus' track record directly contradicted these statements and any decline in investments was the result of TREO's action (or inaction).[80]

## J. *TREO's actual malice*

TREO made the defamatory statements with actual malice because it ignored the information in the Fund's books and records, which showed that plaintiffs managed the Fund successfully and did not engage in misconduct.[81] TREO's actual malice is also shown by its refusal to retract its statements, despite plaintiffs' counsel's demand.[82]

## K. *Plaintiffs' claims*

The complaint asserts three counts: Defamation *per se* against Corbin and Gatewood for the statements in The Wall Street Journal;[83] Defamation by Implication against Corbin for the statements in With Intelligence and Alternatives Watch;[84] and Defamation *per se* against TREO for statements made in the December 6, 2023 letter to investors.[85] Plaintiffs assert that the defamatory statements caused substantial reputational and economic harm.[86]

---

[80] Compl., ¶¶ 97–102.
[81] *Id.*, ¶ 104.
[82] *Id.*, ¶¶ 105–06.
[83] *Id.*, ¶¶ 115–30.
[84] *Id.*, ¶¶ 131–44.
[85] *Id.*, ¶¶ 146–60.
[86] *Id.*, ¶¶ 107–13.

## III.    *THE PARTIES' CONTENTIONS*

Each defendant filed a motion to dismiss.  Corbin asserts plaintiffs are collaterally estopped from pursuing this action because the Court of Chancery has already determined that Invictus and Patel breached their fiduciary duties. Therefore, the statements in the articles are true, and plaintiffs are estopped from claiming they are false.

Corbin and Gatewood each moved to dismiss under Rule 12(b)(6) because the statements are non-actionable opinions and the complaint fails to adequately plead actual malice.

TREO filed a motion for partial dismissal, asserting that plaintiffs' claim filed in this Court amounts to impermissible claim splitting and plaintiffs should not be permitted to continue with this duplicative litigation.[87]

Plaintiffs respond that the Court of Chancery litigation addresses post-removal contract disputes, and therefore, that court's ruling does not estop plaintiffs from pursuing this action, which is based on pre-removal behavior.  Further, the Court of Chancery did not make a finding of breach of fiduciary duties.

---

[87] TREO states in a footnote that this action lacks merit because the investor letter is substantially true, and the statements are subject to a common interest privilege. TREO MTD, fn.4.  As TREO admits, these are affirmative defenses.  The Court will not address these conclusory and procedurally improper arguments.

Plaintiffs also argue that Corbin's and Gatewood's statement that plaintiffs breached their fiduciary duties is a verifiable fact and thus, the statements are not protected opinions. Additionally, taking all of Corbin's and Gatewood's actions and statements together, plaintiffs have sufficiently alleged actual malice.

Lastly, plaintiffs assert that the Court of Chancery lacks subject matter jurisdiction over defamation claims and so asserting the claim here cannot be improper claim splitting.

## IV.     STANDARD OF REVIEW

A motion to dismiss for failure to state a claim upon which relief can be granted is brought under Superior Court Civil Rule 12(b)(6).[88] Under Rule 12(b)(6), all well-pleaded allegations in the complaint must be accepted as true.[89] Even vague allegations are considered well-pleaded if they give the opposing party notice of a claim.[90] However, the Supreme Court has instructed that the trial court must "ignore conclusory allegations that lack specific supporting factual allegations."[91] The trial court is not required to accept every strained interpretation of the allegations proposed by the plaintiff, but the plaintiff is entitled to all reasonable inferences that

---

[88] *See* Del. Super. Ct. Civ. R. 12(b)(6).

[89] *See Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

[90] *Sees v. Mackenzie*, 2023 WL 5202675, at *2 (Del. Super. Aug. 14, 2023) (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[91] *Ramunno v. Cawley,* 705 A.2d 1029, 1034 (Del. 1998).

logically flow from the complaint.[92]  At this stage of the proceedings, the court is required to construe the allegations in the complaint in the plaintiff's favor.[93]

## V.      DISCUSSION

### A.      *Collateral Estoppel*

"To satisfy the falsity element of a defamation claim, [a] plaintiff must allege that the complained of statement is 'substantially false.'   Thus, '[if] an alleged defamatory statement is 'substantially true,' a claim of libel is legally insufficient and should be dismissed."[94]

In the articles, Corbin is alleged to have accused plaintiffs of engaging in "operational conduct not befitting a fiduciary," which plaintiffs assert means a breach of fiduciary duties.  Corbin contends that this statement is substantially true because "the Court of Chancery made factual findings demonstrating Plaintiffs did engage in conduct that is inconsistent with their fiduciary duties."[95]  Corbin also contends that because of the Court of Chancery's findings, plaintiffs are collaterally estopped from litigating the falsity of the statement.

---

[92] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).
[93] *Ramunno,* 705 A.2d at 1036.
[94] *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017) (quoting *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12 (1st Dep't 2015)).  *See Ramada Inns, Inc. v. Dow Jones & Co.*, 543 A.2d 313 (Del. Super. 1987); *see also Vice v. Kasprzak*, 318 S.W.3d 1 (Tex. App. 2009).
[95] Corbin MTD, p. 15.  The parties submitted supplemental letters on May 30, 2025, arguing the impact of the Court of Chancery's May 23 ruling on the ERISA claims.

24

Collateral estoppel "requires that (1) a question of fact essential to the judgment (2) be litigated and (3) determined (4) by a valid and final judgment."[96] "Collateral estoppel applies when the facts sought to be precluded in a subsequent suit have been 'actually litigated and determined' in the first case"[97] and where the issues are "substantially similar."[98]

Plaintiffs argue that the Court of Chancery ruled on contractual claims (and not a breach of fiduciary duties) and, in any event, the conduct referenced related to post-removal action.[99] Therefore, that court's ruling did not address the reason for Invictus' removal from management, and collateral estoppel does not apply.

When pressed at oral argument over Corbin's seemingly inconsistent positions of the claims being both barred by collateral estoppel (which would require a "fact" to have been establish) and non-actionable opinion (Corbin's next argument), Corbin clarified: the statements in the articles are non-actionable opinions, but if the Court were to construe them to be facts, then collateral estoppel applies.[100] Because Corbin abandoned its collateral estoppel argument, the Court will not address the merits of this argument.

---

[96] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).
[97] *United Parcel Serv. v. Hawkins*, 314 A.3d 663 (TABLE), 2024 WL 666726, at *3 (Del. 2024).
[98] *Messick v. Star Enter.*, 655 A.2d 1209, 1211–12 (Del. 1995).
[99] Corbin argued that the timing of plaintiffs' breach of fiduciary duty does not matter. If they were found to have breached their duties, the defamation claim must be dismissed regardless of whether the statement was false at the time it was made. Corbin provided no authority for this proposition. D.I. 58, Hearing Tr., April 15, 2025, pp. 11–14.
[100] *Id.*, pp. 9–10.

**B.** *Defamation – Corbin's and Gatewood's motions*

**1.** *Choice of Law*

The parties dispute which state's substantive law applies to the defamation claims. The first step in a choice of law analysis is to determine whether the forum state's law is in conflict with the jurisdiction with the "most significant relationship."[101] If there is no conflict (also known as a "false conflict"), the court will apply the substantive law of the forum state.[102]

In defamation cases where the statements are published on the internet, the law of plaintiff's home state usually applies, unless "with respect to the particular issue, one of the other states has a more significant relationship to the occurrence and the parties."[103]

Plaintiffs argue that Texas law applies because Patel resides in Texas, and the defendants have not overcome the presumption of Texas law applying.

---

[101] Restatement (Second) of Conflict of Laws § 145 (1971); Under the most significant relationship test, the court analyzes: (1) where the injury occurred; (2) where the underlying conduct occurred; (3) where the parties are located and do business; and (4) where the parties' relationship is centered, to determine which jurisdiction has the most significant relationship. *See Travelers Indem. Co. v. Lake,* 594 A.2d 38 (Del. 1991) (extending the "most significant relationship" test to tort cases); *see also Thornton v. Boswell,* 1995 WL 656807 (Del. Super. Nov. 6, 1995).

[102] *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *12 (Del. Super. June 24, 2021) (citing *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156 (Del. 2010)).

[103] *Armenta v. G/O Media Inc.*, 2024 WL 4433946, at *5 (Del. Super. Oct. 7, 2024) (quoting *Stephen G. Perlman, Rearden LLC v. Vox Media, Inc.*, 2015 WL 5724838 (Del. Ch. Sept. 30, 2015) (quoting *Aoki v. Benihana, Inc.,* 839 F. Supp. 2d 759, 765 (D. Del. 2012))).

Corbin argues that New York law applies because it is the state with the most significant relationship—defendants' principle places of business is New York, the services were rendered to defendants while in New York, and the statements were made to the New York-based The Wall Street Journal. It also argues that New York has a strong interest in protecting the speech of its residents, as shown by its anti-strategic litigation against public participation (anti-SLAPP) law.

Gatewood argues that New York law applies, but even if Texas or Delaware law were applied, plaintiffs still fail to state a claim.[104]

"'Defamation is the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'"[105]

To state a claim for defamation under New York law, a plaintiff must allege: "(i) a false statement; (ii) publication; (iii) fault; and (iv) one of four *per se* injuries, including, … (a) an accusation of a serious crime or (b) business harm [and] the

[104] Gatewood MTD, pp. 10-12.

[105] *Zuckerbrot v. Lande*, 167 N.Y.S.3d 313, 330 (N.Y. Sup. Ct. 2022) (quoting *Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37 (1st Dept. 2014)); *Cousins v. Goodier*, 283 A.3d 1140, 1148 (Del. 2022) ("A statement is defamatory when it 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" (citation omitted); *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018). ("Defamation is a tort, the threshold requirement for which is the publication of a false statement of fact to a third party.").

alleged defamation must be 'of or concerning the plaintiff.'"[106] Essentially the same elements are required under Texas and Delaware defamation law.[107]

The difference between New York and Texas law is whether plaintiffs are required to prove actual malice. Under Texas law, a plaintiff must plead (and prove) actual malice if the defamed party is a public figure.[108] Plaintiffs argue that Patel is not a public figure.

Under New York's anti-SLAPP statute, a plaintiff must show actual malice if the matter is one of public interest.[109]

The Court need not decide whether New York or Texas law applies or whether Patel is a public figure because plaintiffs concede that they must show actual malice. Plaintiffs assert a claim for punitive damages, which requires a showing of actual

---

[106] *US Dominion, Inc. v. Fox News Network, LLC*, 2021 WL 5984265, at *21 (Del. Super. Dec. 16, 2021) (applying New York law) (internal citation omitted); *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (N.Y. App. Div. 1994) (internal citation omitted).

[107] *See also Lilith Fund for Reprod. Equity v. Dickson,* 662 S.W.3d 355, 363 (Tex. 2023) (the elements for defamation under Texas law requires "a plaintiff [to] prove '(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases.'") (citing *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015)). *See Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005) (the elements for defamation under Delaware law requires "a [plaintiff to] plead and ultimately prove that: 1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory."

[108] *In re Lipsky*, 460 S.W.3d at 593 (citing *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998)).

[109] *Travis v. Daily Mail,* 184 N.Y.S.3d 655 (Table) (N.Y. Civ. Ct. 2023).

28

malice.[110]   Because the parties rely on New York, Texas, and to some extent, Delaware law, the Court will as well.

## 2.    *The alleged false statements of fact*

Plaintiffs allege that Corbin and Gatewood defamed them by stating that Invictus was removed due to "***operational conduct not befitting a fiduciary***."[111] Plaintiffs allege Gatewood further defamed them by stating Invictus was removed for its "***utter disregard of its fiduciary obligations***."[112]

Gatewood and Corbin argue that these statements are non-actionable opinions, and therefore, the claims must be dismissed.

Plaintiffs assert that the statements are verifiable facts and, alternatively, the statements imply undisclosed facts upon which the statements are based, thereby making the statements actionable defamation.

## 3.    *False factual statements or non-actionable opinions*

Prior to the United States Supreme Court's decision in *Milkovich v. Loraine Journal Co.* in 1990, many courts applied over-broad protection for "opinions" and adopted the four-part analysis expressed in *Ollman v. Evans*.[113]  The *Ollman* test was derived from dicta in *Gertz v. Robert Welch, Inc.,*[114] and the "perception—as it turns

---

[110] *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) (where plaintiff in a defamation action was entitled to punitive damages because the defendants acted with actual malice).

[111] Compl., ¶¶ 116, 132 (emphasis in original).

[112] *Id*., ¶ 117 (emphasis in original).

[113] 750 F.2d 970 (D.C. Cir. 1984); *see Cousins,* 283 A.3d at 1154.

[114] 418 U.S. 323 (1990).

out, misperception . . . that, in addition to all other Federal constitutional protections, there [was] a 'wholesale defamation exemption for anything that might be labeled "opinion."'"[115]  *Milkovich* clarified that *Gertz* did not create such an exemption and ruled that the "'breathing space' which 'freedoms of expression require in order to survive,' is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'fact' and 'opinion.'"[116]

Under the *Milkovich* analysis, the Constitution protects statements "'relating to matters of public concern which do[] not contain a provably false factual connotation'" and "'statements that cannot 'reasonably [be] interpreted as stating actual facts about an individual.'"[117]

The Delaware Supreme Court reads *Milkovich*

> to hold that statements on matters of public concern are actionable in defamation when, even if presented as "opinion," they may be reasonably construed as stating or implying defamatory facts about an individual that are provably false.  On the other hand, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."[118]

---

[115] *Immuno AG v. J. Moor-Jankowski*, 77 N.Y.2d 235, 242 (N.Y. 1991) ("Thus, statements of opinion relating to matters of public concern are today no less subject to constitutional protection, but speech earns no greater protection simply because it is labeled 'opinion.'"); *Cousins*, 283 A.3d at 1154 (the *Milkovich* court "rejected the notion that *Gertz* was 'intended to create a wholesale defamation exemption for anything that might be labeled 'opinion'"); *Jones v. Heslin*, 2020 WL 1452025, at *3 (Tex. App. Mar. 25, 2020) ("The *Milkovich* court declined to develop an unnecessary and artificial distinction between opinion and factual assertions.").

[116] *Milkovich v. Loraine Journal Co.,* 497 U.S. 1, 18–19 (1990) (cleaned up) (citation omitted).

[117] *Cousins*, 283 A.3d at 1154.

[118] *Id.* at 1155 (quoting *Milkovich,* 497 U.S. at 19 and *Hayes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir. 1993)); *see also Bentley*, 94 S.W.2d at 581 ("In lieu of such distinctions, *Milkovich* focuses the analysis on a statement's verifiability and the entire context in

Courts are to focus on not only the statement's verifiability, but the context in which it was made.[119] "Even when a statement *is* verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as fact."[120] Statements that are not verifiable as fact or that cannot be understood to convey facts, are opinions.[121] An opinion, however, will be actionable "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."[122]

---

which it was made."); *Immuno AG*, 77 N.Y.2d at 243 ("In making this inquiry, courts cannot stop at literalism. The literal words of challenged statements do not entitle a media defendant to 'opinion' immunity or a libel plaintiff to go forward with its action. In determining whether speech is actionable, courts must additionally consider the impression created by the words used as well as the general tenor of the expression, from the point of view of the reasonable person.").

[119] *Dallas Morning News*, 554 S.W.3d at 639; *Samples v. Est. of Brown,* 2024 WL 3249335, at *5 (Tex. App. June 28, 2024) ("Opinions masquerading as fact are still opinions and may not form the basis of a defamation claim."); *Immuno AG*, 77 N.Y.2d at 254–55 (court must first consider "the content of the whole communication, its tone and apparent purpose," …[r]ather than sifting through a communication for the purpose of isolating and identifying assertions of fact…"); *Cousins*, 283 A.3d at 1156–57 (noting that in "service of the streamlined analysis articulated by *Milkovich*," "it may be useful to consider the common usage, context, and social setting of a statement….").

[120] *Dallas Morning News,* 554 S.W.3d at 639 (emphasis in original); *Brian v. Richardson*, 87 N.Y.2d 46, 51 (N.Y. 1995) ("courts are required to consider the larger context in which the statements were published, including the nature of the particular forum.").

[121] *Dallas Morning News* at 624, 639 ("If a statement is not verifiable as false, it is not defamatory."); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (N.Y. 1993) (embracing *Milkovich* which "recognized that 'a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection'"); *Cousins,* 283 A.3d at 1148 ("if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.") (citation omitted).

[122] *Cousins*, 283 A.3d at 1155; *Gross*, 82 N.Y.2d at 153; *Dallas Morning News*, 554 S.W.3d at 624.

The determination of whether a statement is a non-actionable opinion is a question of law[123] and is viewed from the perspective of a reasonable person's perception of the entire publication.[124]

### 4. *Analysis*

#### a. *The Wall Street Journal article*

The Court starts its analysis with the statements. Plaintiffs challenge Corbin's and Gatewood's statement that Invictus was removed for "operational conduct not befitting a fiduciary"[125] and Gatewood's further statement that the removal was due to an "utter disregard of its fiduciary obligations."[126] Plaintiffs argue that the statements amount to allegations that plaintiffs breached their fiduciary duties and are defamatory statements of fact directed to plaintiff's conduct, which is objectively provable. Indeed, parties routinely litigate breach of fiduciary duty claims.[127]

---

[123] *Cousins*, 283 A.3d at 1148; *Dallas Morning News*, 554 S.W.3d, at 639; *Biro v. Conde Nast*, 883 F. Supp. 2d 441 (S.D.N.Y. 2012).

[124] *Jones v. Heslin,* 2020 WL 1452025, at *3 (Tex. App. Mar. 25, 2020); *Lilith Fund for Reprod. Equity*, 662 S.W.3d at 363 ("We answer this legal question from the perspective of a reasonable person's perception of the entirety of the communication, not from isolated statements"); *see Brian v. Richardson*, 87 N.Y.2d 46 (N.Y. 1995) (affirming lower court's dismissal of defamation action finding that as a matter of law the article would be viewed by a reasonable reader as an opinion).

[125] While the complaint also challenges defendants' statements relating to a "failing investment strategy," plaintiffs' counsel acknowledged at oral argument that it is not a statement of fact. D.I. 58, Hearing Tr., p. 79 (referring to the failing investment strategy allegation, "[w]e're not suing them on that because whether a statement is a failing strategy or not, that's not a hard enough statement of fact to sue on.").

[126] Gatewood MTD, Ex. B, WI article.

[127] D.I. 58, Hearing Tr., p. 51; D.I. 39, Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss ("AB"), pp. 27–28.

Plaintiffs then argue that the only context the Court is to consider is the statement themselves and where the statements were published—The Wall Street Journal.[128] This publication is where individuals in the financial industry go to get their news, and the challenged "statements were presented as [a] straightforward, factual explanation for why—according to Defendants—Plaintiffs were removed."[129] And, whether the article includes other bases for the removal is of no consequence, according to plaintiffs, because Corbin and Gatewood did not supply those other statements.[130] Finally, plaintiffs argue that merely adding words like "utter" and "not befitting" do not turn these statements of fact into protected opinions.

Plaintiffs' narrow view of the context is contrary to the law. The Court must view the statements in the context of the whole article.[131] The Wall Street Journal article reported that plaintiffs were removed because of "too aggressive" business tactics, citing a growing concern "about Invictus's management style" as it faced a number of lawsuits, and reported on the Fund being sanctioned by the bankruptcy

---

[128] D.I. 58, Hearing Tr., pp. 53–54.
[129] *Id.*, p. 56; AB, p. 30.
[130] D.I. 58, Hearing Tr., p. 58.
[131] *Immuno AG*, 77 N.Y.2d at 254–55 (court must first consider "the content of the whole communication, its tone and apparent purpose," …[r]ather than sifting through a communication for the purpose of isolating and identifying assertions of fact…"); *Bentley*, 94 S.W.3d at 583 (where analyzing allegedly defamatory statements "depends on their verifiability and the context in which they were made.").

court for spreading "false and misleading information" and being sued by Jefferies for $5 million.[132]

The article also included Invictus' response that Corbin and Gatewood "colluded" to remove Invictus "despite its superlative returns" and that Corbin and Gatewood acted out of self-interest, "without regard to the interests of the fund or minority investors." Invictus called Corbin and Gatewood "predatory seed investors" who perpetuated a fraud on Invictus. Invictus stated that it planned to sue Gatewood for its "exploitative tactics." And, Invictus provided its explanation of the Jefferies litigation and the sanctions.

Finally, the article disclosed the pending Court of Chancery action over Invictus improperly retaining money and that Invictus and Corbin were "fighting with one another over millions of dollars in fees."[133]

In the Court's view, the statements by Corbin and Gatewood cannot reasonably be read to convey actual facts; that is, they are not provably false. Corbin and Gatewood did not accuse plaintiffs of breaching their fiduciary duties, and a person of ordinary intelligence would not perceive the articles of accusing plaintiffs of such behavior.[134]

---

[132] Gatewood MTD, Ex. B, WI article.

[133] *Id.*

[134] Plaintiffs argue that the statements are directed at their conduct and "conduct" is provable—whether plaintiffs acted in a certain manner. Hearing Tr. pp, 50–51. Therefore, they urge, the statements are statements of fact. This approach, however, is too narrow. Many statements relate to a person's conduct, but it cannot be said that merely because the statement is directed to

34

While "[i]t is true that a statement of fact will not be transformed into a statement of opinion solely by use of language expressing uncertainty or qualification,"[135] "the way the speaker frames a statement is relevant to whether a reasonable reader would perceive it as conveying facts."[136] The context of the statements here make clear that the parties are expressing their subjective views of each other. Considering the article as a whole, a reasonable reader would perceive it as the adversaries sparring with each other in the media.[137] The article discussed the various litigations involving Invictus prior to the removal, including the Jefferies litigation and the sanctions. Invictus struck back, calling Corbin and Gatewood "predatory" investors, among other things. Against this stage, the article discussed why Corbin and Gatewood "pulled the plug" on Invictus. Corbin and Gatewood

---

"conduct" that it must be a fact. The Court must look at the whole publication for context, not just the alleged conduct.

[135] *Elias v. Rolling Stone LLC*, 872 F.3d 97, 111 (2d Cir. 2017); *Gross*, 82 N.Y.2d 146 (that is not to say that language "couched" as a hypothesis or conclusion "[can] be understood by the reasonable reader as assertions of fact.") For example, a statement that "'John is a thief' is actionable when considered in its applicable context [and] the statement '*I believe* John is a thief" would be equally actionable when placed in precisely the same context." However, "the assertion that 'John is a thief' could well be treated as an expression of opinion or rhetorical hyperbole where it is accompanied by other statements."; *see also Dallas Morning News*, 554 S.W.3d at 639 (where "even when a statement *is* verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is merely an opinion masquerading as fact.") (emphasis in original).

[136] *Grifold, S.A. v. Yu*, 2025 WL 1826611, at *12 (S.D.N.Y. July 2, 2025); *Lilith Fund for Reprod. Equity,* 662 S.W.3d at 364.

[137] *See Samples,* 2024 WL 3249335, at *5 ("And even when a statement is verifiable, it cannot give rise to liability if 'the entire context in which it was made' discloses that it was not intended to assert a fact."); *Oberc v. Fairlane Cap., Inc.*, 2016 WL 3039658, at *6 (N.D.Tex. May 2, 2016) (analysis depends on a "reasonable person's perception of the entirety of the publication and not merely on individual statements.") (citation omitted)).

35

were expressing their dissatisfaction with Invictus' "too aggressive" management style and failing investment strategy. The tone of Corbin's and Gatewood's statement of "operational conduct ***not befitting*** a fiduciary" and "***utter disregard*** of its fiduciary duties" reflect their subjective view of Invictus' performance.[138]

Plaintiffs next argue that Corbin's and Gatewood's statements are actionable because they failed to disclose facts, thereby implying provable *false* facts about plaintiffs. Specifically, by omitting facts that "contradicted their conclusions," Corbin and Gatewood failed to disclose that plaintiffs were removed on a "no-fault" basis,[139] which would then incorrectly imply that these "undisclosed facts would support (rather than negate) their false statements."[140]

---

[138] *Immuno AG*, 77 N.Y.2d at 255 ("Isolating challenged speech and first extracting its express and implied factual statements, without knowing the full context in which they were uttered, indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context."); *Lilith Fund for Reprod. Equity*, 662 S.W.3d at 364 ("Courts should consider whether the overall language conveys a personal viewpoint about the facts.").

[139] "Defendants also fail to address the critical facts they intentionally concealed that would have revealed their statements to be false—namely, that Plaintiffs were removed as fund managers on a no-fault basis." AB, p. 2.

[140] AB, p. 34.

Plaintiffs' arguments fail for two reasons.[141]  First, the article does not imply that there are undisclosed facts.[142]  The article discloses the bases for the dissatisfaction—aggressive management style, reporting failures, litigations, and sanctions.  Plaintiffs attack these disclosures as misleading because the whole investment strategy for the Fund was investment in distressed situations (such as bankruptcies and litigation finance), which necessarily involved litigation.  But the test is not whether, viewed in the context of the parties' relationship, the statements are misleading.  The test is an objective assessment of how an average reader would perceive the statements.[143]

Second, plaintiffs misconstrue the import of the "no-fault" removal.[144]  They assert that because Corbin and Gatewood exercised their contractual right to remove

---

[141] Plaintiffs also argued that even if the statements are opinions, they are actionable because Corbin and Gatewood did not sincerely hold the opinions that plaintiffs' behavior was cause for the removal because Invictus was removed on a "no-fault" basis.  AB, pp. 36-37.  This, however, misconstrues the law.  *See Lilith Fund for Reprod. Equity,* 662 S.W.3d at 369 ("A subjective belief, even when sincerely held by a speaker, is not the standard for determining whether a statement of opinion is defamatory."); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 397 N.Y.S.2d 943, 951 (N.Y. 1977) ("Both opinions, even if falsely and insincerely held, are constitutionally protected, if the facts supporting the opinion are set forth.").

[142] *Elias*, 872 F.3d at 111 (quoting *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("'[I]f a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable.'")).  *See also Cousins,* 283 A.3d at 1159; *O'Rourke v. Warren*, 673 S.W.3d 671, 689 (Tex. App. 2023).

[143] *Verdi v. Dinowitz*, 218 N.Y.S.3d 6, 14 (N.Y. App. Div. 2024) (citing *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d at 250 ("it has been [a] longstanding policy 'to read published articles in context to test their effect on the average reader, not to isolate particular phrases but to consider the publication as a whole.'"); *Netflix, Inc. v. Barina*, 2022 WL 3908540, at *2 (Tex. App. Aug. 31, 2022); *Kanaga v. Gannett Co., Inc.*, 687 A.2d 173, 180 (Del. 1996).

[144] AB, p. 4, "Critically, that removal was issued on a no-fault basis";  AB p. 35 "[C]ritically, [Corbin and Gatewood] intentionally withheld the fact that Plaintiffs were removed on an expressly 'no-fault' basis"; Compl., ¶ 55 "Despite Invictus's stellar management of the Fund . . .

37

plaintiffs under Section 3.08(b) of the LPA, plaintiffs were in fact, not removed for the reasons stated in the articles, making the statements false. Stated differently, because the removal was "no-fault" and neither Corbin nor Gatewood complained about plaintiffs' management of the Fund, the Court must conclude at this stage that the challenged statements are false. In the Court's view, without more, this is not a reasonable inference. The LPA contains two removal mechanisms, each with a different consequence. The General Partner may be removed under Section 3.08(a) for a "Cause Event" only after a court finds that the General Partner engaged in prohibited conduct. Removal under Section 3.08(b) may be for "any reason and without cause" and the removal is effective immediately. Because the removal under this section is "for any reason," without some other basis to infer that the limited partners held the view that Invictus committed no wrongs, the allegation is merely conclusory, which the Court cannot accept on a motion to dismiss. Additionally, even if false, the opinions are not actionable because the bases for the opinions are disclosed, and there is no suggestion that the removal was for additional reasons unknown to the reader.

The statements in The Wall Street Journal are protected opinions and therefore, Count I is **DISMISSED**.

---

Corbin and Gatewood . . . removed Invictus as manager ***on a no-fault basis***." (emphasis in original); Compl., ¶ 136 ". . . [i]n fact, Corbin and Gatewood removed Invictus for ***no***-fault." (emphasis in original) .

38

### b.     *With Intelligence and Alternatives Watch articles*

Defamation by implication is a subtype of textual defamation, with the defamatory meaning arising from the statement's text.[145]  "[T]o determine whether a defamation by implication has occurred, the question is the same as it is for defamatory content generally: is the publication 'reasonably capable' of communicating the defamatory statement?"[146]  The Court must determine whether the meaning the plaintiff alleges arises from an objectively reasonable reading of the publication as a whole.[147]  "[A] plaintiff who seeks to recover based on a defamatory implication . . . must point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'"[148]  Evidence of the defendant's intent, which is an objective analysis, must arise from the article itself.[149]

If the court finds that a statement is implicitly defamatory, it will be non-actionable if it is not verifiable as false or, even if verifiable, the statement discloses that it was not intended as a fact.[150]

---

[145] *Dallas Morning News*, 554 S.W.3d at 627, 629;  *Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d at 42.

[146] *Dallas Morning News,* 554 S.W.3d at 629; *see Biro v. Conde Nast*, 883 F. Supp. 2d 441, 465 (S.D.N.Y. 2012).

[147] *Dallas Morning News*, 554 S.W.3d at 627, 629, 635; *Stepanov*, 987 N.Y.S.2d at 42 (internal citations omitted).

[148] *Dallas Morning News*, 554 S.W.3d at 627, 635; *Biro*, 883 F. Supp. 2d at 466.  *See also Stepanov v. Dow Jones,* 987 N.Y.S.2d at 44.

[149] *Id.*

[150] *Dallas Morning News*, 554 S.W.3d 614, at 638–39.  *See generally Biro*, 883 F. Supp. 2d 441.

The Court again starts with the challenged statement.  In the With Intelligence and Alternatives Watch articles, Corbin stated that Invictus was removed after a "sustained period of worsening investment and ***operational conduct not befitting a fiduciary***."[151]  Plaintiffs allege that this statement is defamatory because it implies that Invictus was removed as a result of discovered misconduct.[152]  This defamatory implication, plaintiffs argue, is bolstered by Corbin's failure to disclose that the removal was on a no-fault basis.

In defamation by implication, a plaintiff must point to additional affirmative evidence in the publication that the defendant intended a defamatory meaning.  Plaintiffs here failed to do so.  First, the With Intelligence article disclosed the no-fault removal.  The Court cannot review the challenged statement without also considering the context of the entire publication.  Thus, plaintiffs' theory is refuted by the article itself.  Second, with respect to Alternatives Watch, the failure to disclose the provision used to remove Invictus is not affirmative evidence in the article itself.[153]

---

[151] Corbin MTD, Ex. D, Ex. F (emphasis added).

[152] Compl., ¶ 133; AB, p. 38.

[153] Plaintiffs rely on *Freedom Comms., Inc. v. Coronado*, 296 S.W.3d 790, 801 (Tex. App. 2009) for the proposition that an omission of relevant information can bolster a defamation by implication claim. AB, p. 38.  The Texas Supreme Court, however, vacated the decision because the trial court judge had a disqualifying conflict, making the ruling "void" and therefore, the intermediate appeals court lacked jurisdiction to address the merits.  *Freedom Comms., Inc. v. Coronado*, 372 S.W.3d 621 (Tex. 2012).  Plaintiffs cite no other case for the proposition that an omission is affirmative evidence.

Even if the articles satisfied the defamatory inference element, the statement is a non-actionable opinion. As with The Wall Street Journal article, these articles reflect the parties' subjective view of the other. The articles disclosed the bases for Corbin's view, such as the Jefferies and fee dispute litigations, and the failure to meet reporting requirements. The Alternatives Watch article cited additional grounds for removal under the heading "Corbin claims unorthodox behavior of Invictus." Plaintiffs responded in each article, asserting that Corbin acted out of its own self-interest. Invictus called "absurd" the "implication" that plaintiffs had taken any money from the Fund. Plaintiffs further stated that Corbin created a false narrative to avoid paying fees it owed to Invictus.

Additionally, the articles do not imply that there are undisclosed facts.[154]

Because the statement in the Alternatives Watch and With Intelligence articles are protected opinions, Count II is **DISMISSED**.

C. *TREO's motion*

1. *Claims splitting*

"Delaware takes a modern 'transactional' view of claim splitting, barring overlapping complaints that arise from the 'same transaction' or from a 'common

---

[154] *Elias*, 872 F.3d at 111 (quoting *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997); *Cousins*, 283 A.3d at 1156 (quoting *Ramunno*, 705 A.2d at 1035); *cf. Dallas Morning News,* 554 S.W.3d 614.

41

nucleus of operative facts.'"[155] Claim splitting involves claims brought in different courts regardless of the procedural status of either, and "is meant to prevent burdening defendants with duplicative pleadings in different courts brought by the same plaintiff based on different causes of action arising out of a common nucleus of facts."[156] "To prevail on a theory of claim splitting a defendant must establish that the same transaction forms the basis for the prior and subsequent actions, and that 'the plaintiff must have not raised a claim in the first action that he or she should have, in fairness, raised.'"[157]

TREO contends that this action should be dismissed because of impermissible claim splitting. The first-filed Court of Chancery action involves claims arising from actions after Invictus' removal from management of the Fund, and the claims here also relate to post-removal actions (*i.e*., TREO's letter). While recognizing that the Court of Chancery does not have jurisdiction over defamation claims, TREO argues that that court can exercise jurisdiction under the clean-up doctrine, and it will likely do so here.[158]

---

[155] *Goureau v. Lemonis*, 2021 WL 1197531, at *22 (Del. Ch. Dec. 4, 2020) (citing *Villare v. Beebe Med. Ctr., Inc.*, 2013 WL 42296312, at *3 (Del. Super. May 21, 2013)).

[156] *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *18 (Del. Ch. Dec. 23, 2008).

[157] *Feenix Payment Sys., LLC v. Blum*, 2024 WL 3861376, at *5 (Del. Super. Aug. 19, 2024) (quoting *Ford v. Sedgwick Claims Mgmt. Servs., Inc.*, 2020 WL 2557141, at *3 (Del. Super. May 20, 2020)).

[158] D.I. 43, TREO Reply Brief in Support of Their Partial Motion to Dismiss, p. 6.

Plaintiffs counter that the Court of Chancery lacks jurisdiction over defamation claims and the defamation claim is not a compulsory counterclaim.[159]

## 2. *Analysis*

The Court of Chancery is a court of limited jurisdiction.[160]  It is well-settled that "the Court of Chancery, in all instances, lacks subject matter jurisdiction to adjudicate the questions of whether a defendant made a false statement about the plaintiff and whether it did so with actual malice."[161]  Defamation claims "'are seen as denizens of the Superior Court, and are subject to the findings made there by juries regarding the speech of their peers.'"[162]

It is true that the Court of Chancery may exercise jurisdiction under the clean-up doctrine over a claim which it does not otherwise have jurisdiction.[163]  The court may do so, in its discretion, to avoid piecemeal litigation, and has done so to hear defamation claims.[164]  But this Court will not put another court in the position of

---

[159] TREO did not respond to the compulsory counterclaim argument.

[160] *Smith v. Scott,* 2021 WL 1592463, at *14 (Del. Ch. Apr. 23, 2021).

[161] *Id.*; *see also Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *17 (Del. Ch. Aug. 30, 2019) (noting lack of jurisdiction over defamation claims except in the limited circumstance of "trade libel").

[162] *Dunn* at *17 (quoting *Preston Hollow Cap., LLC v. Nuveen, LLC*, 2019 WL 3801471, at *4 (Del. Ch. Aug. 13, 2019); *Smith,* 2021 WL 1592463, at *14 ("Suffice it to say that issues of 'falsity and malice [are] for the collective wisdom of a jury rather than [ ] a judge as the sole arbiter of defamation and libel.'") (citation omitted).

[163] *Smith,* 2021 WL 1592463, at *14.

[164] *Id.*; *see Laser Tone Bus, Sys., LLC. v. Delaware Micro-Computer LLC,* 2019 WL 6726305 (Del. Ch. Nov. 27, 2019) (post-trial decision ruling on defamation claim).

having to decide whether to exercise its discretion and accept jurisdiction over a defamation claim.

TREO claims that it does not matter if the Court of Chancery does not have jurisdiction, Count III must be dismissed because this action arises out of the same transactions as the Court of Chancery complaint, plaintiffs knew of the common factual basis, and plaintiffs should have fairly raised the claim in that court. However, TREO never explains how plaintiffs should have fairly raised a claim over which the Court of Chancery lacks jurisdiction.[165]

Because the Court of Chancery lacks jurisdiction over the defamation claim, it cannot be said that plaintiffs should have fairly raised the claim in the first-filed action. TREO's partial motion to dismiss is **DENIED**.[166]

---

[165] *See Maldonado v. Flynn,* 417 A.2d 378, 383 (Del. Ch. 1980) (the rule against claim splitting does not apply "where it appears that a plaintiff could not for jurisdictional reasons have presented his claim in its entirety in a prior adjudication").

[166] In its reply brief, TREO requests a stay for the first time. It states: "for the reasons set for in the separately filed motions by the other defendants in this case" and the substantial overlap in facts with the Court of Chancery action, the Court should stay this action. D.I. 43, p. 7; Hearing Tr., p. 41. TREO's argument was not fairly raised in its motion and therefore, the Court will not address it.

## VI. CONCLUSION

Corbin's and Gatewood's motions to dismiss are GRANTED. Counts I and II are DISMISSED.

TREO's motion to dismiss is DENIED.

**IT IS SO ORDERED**.

/s/Kathleen M. Miller
Kathleen M. Miller, Judge